**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | **Civil Action No: 15-2881** |
| **v.** | |
| **KRAFT FOODS GROUP, INC. and MONDELĒZ GLOBAL LLC,** | **Hon._____** |
| **Defendants,** | |

**COMPLAINT FOR INJUNCTIVE RELIEF,
CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF**

The U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, hereby alleges as follows:

## I.    INTRODUCTION

1.    During Fall 2011, Kraft Foods Group, Inc. and Mondelēz Global LLC (collectively "Defendants" or "Kraft"), by and through the acts of certain its officers, agents or employees, engaged in a manipulative and deceptive scheme to manipulate or attempt to manipulate the prices of the December 2011 wheat futures contract traded on the Chicago Board of Trade ("CBOT") and cash wheat.  At the same time, Kraft also held wheat futures positions in excess of speculative position limits established by the Commission.

2.    In addition, beginning in at least 2009 and continuing through January 2014, Kraft, by and through the acts of certain its officers, agents or employees, engaged in noncompetitive trades by trading both sides of an exchange-for-physical ("EFP") CBOT wheat contract at least five times per year.

3.      By engaging in this conduct and the conduct further described herein, Kraft has

engaged, is engaging, or is about to engage in acts and practices that violate the Commodity

Exchange Act (the "Act"), 7 U.S.C. §§ 1 *et seq*. (2012), and Commission Regulations

("Regulations") promulgated thereunder, 17 C.F.R. §§ 1 *et seq*. (2014).  Specifically, by using a

deceptive or manipulative device in connection with the December 2011 wheat futures contract

and cash wheat, Kraft violated Sections 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and

Regulation 180.1, 17 C.F.R. § 180.1 (2014).  In addition, by manipulating and attempting to

manipulate the prices of the December 2011 wheat futures contract and cash wheat, Kraft

violated Sections 6(c)(3) and 9(a)(2) of the Act, 7 U.S.C. §§ 9(1) and 13(a)(2) (2012), and

Regulation 180.2, 17 C.F.R. § 180.2 (2014).  Further, by holding wheat futures positions in

excess of Commission speculative position limits set forth in Regulation 150.2, 17 C.F.R.

§ 150.2 and CBOT speculative position limits, Kraft violated Sections 4a(b) and (e) of the Act,

7 U.S.C. § 6a(b) and (e) (2012).  Finally, by engaging in wash sales by trading both sides of EFP

contracts, Kraft violated Section 4c(a) of the Act, 7 U.S.C. § 6c(a) (2012), and Regulation

1.38(a), 17 C.F.R. § 1.38(a) (2014).

4.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act,

7 U.S.C. § 13a-1 (2012), to enjoin Kraft's unlawful acts and practices and to compel its

compliance with the Act and Regulations.  The CFTC also seeks civil monetary penalties and

remedial ancillary relief, including disgorgement, pre- and post-judgment interest, and such other

equitable relief as this Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act,

7 U.S.C. § 13a-1(a) (2012), which authorizes the CFTC to seek injunctive relief against any

person whenever it appears that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

6.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Kraft is located and transacts business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

### III.     PARTIES

7.      Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2012)*,* and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2014).

8.      Defendant **Kraft Foods Group, Inc.** is one of North America's largest consumer packaged food and beverage companies, with headquarters in Northfield, Illinois.  It has never been registered with the Commission.

9.      Defendant **Mondelēz Global LLC** operates the North American snack food business for Mondelēz International, Inc., from its headquarters in Deerfield, Illinois.  It has never been registered with the Commission.

10.      During the time period covered by this Complaint, Kraft Foods Inc. owned Kraft Food Group, Inc., which operated the North American snack food business that is the subject of this Complaint.  In October 2012, Kraft Foods Inc. effected a spin-off transaction where (a) Kraft Foods Group, Inc. transferred the North American snack foods business to its then-affiliate Mondelēz Global LLC and (b) Kraft Foods Inc. then distributed Kraft Foods Group, Inc. to its shareholders in a tax-free spin-off.  Kraft Foods Inc. then changed its name to Mondelēz

International, Inc., which has since owned Mondelēz Global LLC, which operates the North American snack food business. The operative spin-off agreements apportion liability between Kraft Foods Group, Inc. and Mondelēz International, Inc.

## IV.    FACTS

### A.    Background

11.    Kraft is one of the largest domestic end users of #2 Soft Red Winter Wheat, which is the variety of wheat deliverable against the CBOT wheat futures contract. Kraft consumes approximately 30 million bushels of wheat per year (or roughly 2.5 million bushels per month) for use in production of products like Oreo, Chips Ahoy!, Ritz, Triscuit, and Wheat Thins. Ninety percent of the wheat used by Kraft is milled into flour at Kraft's Toledo, Ohio Flour Mill (the "Mill") on the Maumee River, which flows into Maumee Bay, Lake Erie.

12.    In order to produce usable flour, Kraft requires wheat for milling that meets certain specifications for baking and human consumption. These specifications include the permissible numbers of insect damaged kernels and maximum allowable levels of vomitoxin (a mycotoxin that may be produced in wheat infected by Fusarium head blight or scab). According to U.S. Food and Drug Administration guidance, finished baked goods must have a vomitoxin level below one part per million. Normal wheat milling processes and cleaning technologies can substantially reduce vomitoxin levels in finished flour by approximately one-half from the level in unprocessed wheat. Vomitoxin levels in finished flour also can be reduced in the milling process by blending in wheat possessing lower vomitoxim levels.

13.    Kraft will also consider certain baking characteristics of wheat, including gluten content and solvent retention levels, to ensure that it is able to produce flour that will meet its baking needs.

4

14.     Kraft typically purchases wheat on a daily basis throughout the year, seeking to ensure that it always has sufficient supply for the Mill.  Kraft has the capacity to store 5 million bushels of unprocessed wheat at the Mill, and it strives to maintain two months' supply in its inventory.

15.     Kraft has two primary options for obtaining the wheat it requires.  First, it can purchase wheat directly from a grain producer or wholesaler in the cash market.  When Kraft sources through the cash market, it can negotiate the wheat specifications in the contracts to ensure that the quality of wheat meets its requirements.  For example, in its contracts, Kraft regularly specifies a maximum vomitoxin level of 2 parts per million and maximum insect damaged kernels of 3 per 100 grams.

16.     When Kraft purchases wheat in the cash market, it can also negotiate the delivery location and process.  Because of the location of the Mill, when it purchases in the cash market, Kraft will ordinarily source wheat from the Toledo region, which includes Ohio, Indiana, Michigan, and Ontario, and have it delivered to the Mill by rail or truck.  Warehouses and shipping stations outside the Toledo region, including those down the Mississippi River, are not required to transport wheat to Toledo by rail or truck.  Consequently, it is not advantageous for Kraft to take delivery of wheat down the Mississippi River, as Kraft would have to arrange for the wheat to be barged to a location where it could be transferred to rail, and then shipped to the Mill, significantly increasing the cost to Kraft.  It is not possible to barge wheat directly from locations down the Mississippi River to the Mill.

17.     Kraft's second primary option for sourcing wheat is to purchase wheat futures contracts sold on the CBOT.  The CBOT is a registered entity as defined in Section 1a(40) of the Act and is one of four designated contract markets for trading futures contracts pursuant to

Section 5 of the Act that make up the CME Group, Inc. ("CME"). The CBOT maintains rules applicable to futures trading of wheat and the CME conducts surveillance and compliance activities related to CBOT trading.

18.     A futures contract is a standardized agreement between two parties to purchase or sell a predetermined quantity of a commodity during a future month, at a price that is determined at the initiation of the contract. The trader who purchases the commodity is said to have a "long position," while the trader who sells the commodity is said to have a "short position." Futures contracts may be settled by delivery of the actual commodity at the conclusion of the contract or "offset" by entering an equal and opposite trade, effectively eliminating the original position.

19.     Chapter 14 of the CBOT Rules governs the specifications for and trading of wheat futures. A wheat futures contract consists of 5,000 bushels of wheat, subject to further quality specifications. (CBOT Rules 14102.B, 14104). The minimum price fluctuation for trading wheat futures is ¼ cent per bushel, which is equivalent to $12.50 per futures contract, including spreads. (CBOT Rule 14102.C.) CBOT wheat futures contracts are traded for delivery during five different contract months each calendar year: March, May, July, September, and December. (CBOT Rule 14102) Delivery on the CBOT wheat contract is effected when the seller of the futures contract tenders a "shipping certificate" (which represents an interest in wheat for load-out from a CBOT-approved delivery facility) to the buyer of the futures contract. (See generally CBOT Rules 14105-14110) Shipping certificates may also be bought and sold between traders or exchanged for futures positions.

20.     Wheat acquired via the futures market is typically of a lower quality than that sourced in the cash market. For example, during the time period covered by this Complaint CBOT rules specified that deliverable wheat could have vomitoxin levels of up to 4 parts per

million (CBOT Rule 14104); the deliverable wheat actually available rarely had levels below two parts per million.

21.    Further, parties who take delivery of CBOT wheat do not have the ability to specify delivery location or load out process, nor do they even know the delivery location for the contracts they have purchased until they receive shipping certificates.

22.    Because of the inability to control wheat quality or delivery location, Kraft rarely takes delivery of wheat via the CBOT delivery process.  Indeed, Kraft typically specifies in its cash market contracts that it will not accept wheat registered for delivery under CBOT contracts because such wheat is typically blended down by mixing lower quality product so that the overall mixture will barely meet the minimum CBOT requirements.

23.    Prior to Fall 2011, Kraft last took delivery of wheat via the CBOT delivery process in 2002.  Instead of taking delivery of CBOT wheat, Kraft normally uses the futures markets to hedge its cash wheat purchases, taking long futures positions that roughly correlate with its actual wheat needs and then offsetting these positions as it acquires physical wheat in the cash market.

### B.    Kraft Manipulated or Attempted to Manipulate the Wheat Markets During Fall 2011

24.    In late Summer 2011, cash wheat prices for #2 Soft Red Winter Wheat at Toledo, Ohio had risen from a price of $5.74 per bushel on June 30, 2011 to $7.72 per bushel on August 26, 2011.  Over the same time, the price of December 2011 CBOT wheat futures increased from $6.57½ to $7.97.  Even though cash wheat prices were rising, there was sufficient wheat available in the cash wheat market for Kraft to purchase and deliver to the Mill to satisfy Kraft's needs.

25.     In response to these elevated cash prices, however, Kraft deviated from its practice of using the futures markets solely to hedge its cash wheat purchases.  Kraft wheat procurement staff developed, and Kraft senior management approved, a strategy to use its status as a commercial hedger to acquire a huge long position in December 2011 wheat futures in order to induce sellers to believe that Kraft would take delivery, load out, and use that wheat in its Mill.  In developing the strategy, Kraft, acting through certain of its procurement staff and certain senior management, intended that the futures market would react to its enormous long position by increasing the price of the December 2011 futures contract while reducing the differential between the December futures price and the price of the cash market wheat.  Kraft executed its plan, and the market reacted as Kraft expected, yielding Kraft more than $5.4 million in futures trading profits and savings from its strategy.

26.     In fact, Kraft, acting through its procurement staff, acquired its December 2011 long position without any intention of loading out, delivering, and using the majority of the CBOT wheat it stood to acquire.

27.     Kraft, acting through its procurement staff, executed a "trial run" of this strategy in September 2011, taking delivery of 250,000 bushels of CBOT wheat, which constituted fifty total certificates.  Upon standing for delivery, thirty-one of the fifty certificates that Kraft received in September 2011 were for wheat located at locations on the Mississippi River that were more than 650 miles from the Mill and would have required at least two changes in mode of transport and shipment in the opposite direction of the commercial flow of wheat to bring to the Mill.  This meant that Kraft could not use barges to transport the wheat directly to the Mill and, due to exchange rules, Kraft could not require that the wheat be loaded directly on to rail

transport. As a result of this test involving just fifty certificates, Kraft knew that it could not rely upon taking delivery of CBOT wheat to source wheat easily transportable to the Mill.

28. At around the same time, Kraft submitted a public comment to the Commission in response to a proposed change to CBOT rules removing language requiring wheat delivery facilities to be connected to railroad service. Kraft's comment requested that the language not be removed. Kraft's position was not adopted.

29. Nevertheless, in October 2011, Kraft wheat procurement staff proposed to Kraft senior management that Kraft adopt a strategy of buying $90 million of December 2011 wheat futures in early December 2011 in order to depress the price of wheat in the cash market and inflate the futures price of wheat.

30. In an October 20, 2011 email to Kraft's Chief Financial Officer and other senior management, the Kraft Senior Director Global Procurement, explained the strategy as follows:

> Given our proposal to "take physical delivery in Dec" of 15 mm bushels at 50 cents per bushel below the commercially offered price results in the savings of $7mm+.
>
> In addition, **there is a key market dynamic that is important to understand: Once the market sees that Kraft is "stopping" December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft.** We will then have the option of redelivering the wheat acquired through the futures market. This will then quickly reverse the negative cash flow impact.

(emphasis added).

31. When considering the Kraft procurement staff's $90 million December 2011 wheat futures proposal, Kraft senior management required that the futures position could not exceed $50 million by the end of December. Kraft procurement staff agreed to sell at least $40 million of the proposed $90 million position by the end of the month. Kraft senior management then approved the procurement staff proposal for Kraft to buy $90 million of December 2011

wheat futures, knowing that procurement staff would sell $40 million of the position before the end of the month.

32.     Kraft did not have a *bona fide* commercial need for $90 million of wheat – which would amount to approximately 15 million bushels, or a six-month supply for the Mill – in December 2011.  Kraft had never possessed that quantity of wheat, and had no ability to store that quantity of wheat within its own facilities.  Indeed, Kraft did not even have a *bona fide* commercial need for or present ability to store $50 million of wheat (its proposed $90 million position net of selling $40 million) – which would amount to more than an additional three months' supply for the Mill.

33.     As of November 2011, Kraft already possessed more than 4.2 million bushels of wheat in storage at the Mill, which represented more than 80% of its storage capacity.  If Kraft were to have taken delivery of 15 million bushels of wheat – an amount equivalent to approximately 3,000 certificates – in December 2011, it would have had to locate additional storage and pay additional costs of approximately five cents per bushel for nearly all of the wheat for up to six months.  In addition, in order to use CBOT wheat, Kraft would have had to buy – and store – yet additional higher-quality cash wheat to blend with the lower-quality CBOT wheat so as to ensure the wheat would meet its baking specifications.  Thus, Kraft would have needed to locate and pay for storage of far in excess of 15 million bushels.

34.     Kraft never intended to take delivery of 15 million bushels of wheat, but instead desired to make the market believe that it would take delivery, load out, and store that wheat for use in the Mill.  Kraft intended for the market to react to its long position by lowering the price of cash wheat available in the Toledo area, which would allow Kraft to obtain wheat in the cash

market at more favorable prices. Kraft also intended to profit from the positions it held in December and March wheat futures by narrowing the spread between the two contracts.

35.     Kraft procurement employees, including the Senior Director Global Procurement and the Associate Director of Procurement, executed the strategy, ultimately accumulating 3150 long CBOT December 2011 wheat futures contracts by November 29, 2011, the first day of the delivery period, equivalent to 15.75 million bushels or approximately $93.5 million of wheat. As of December 7, 2011, Kraft's spot month wheat position constituted 87% percent of the CBOT December 2011 wheat futures open interest.

36.     In a second email to Kraft senior management on December 2, 2011 email, the Kraft Senior Director Global Procurement confirmed that the strategy was working as planned:

> As you may recall, we established a long Dec Wheat/Short March Wheat spread at 35 cents (Mar premium to Dec) for the purpose of taking delivery of CME wheat, representing a $7MM+ saving over commercially sourced wheat. Since Monday we have "stopped" 2.2MM bushels of wheat at a cost of $13.2MM. **As expected, the Dec/Mar spread has narrowed to app[roximately] 11 cents resulting in a marked to market gain of $3.6MM on our open spread position. Meanwhile, with the narrowing spread, the cash wheat basis has declined from +80 cents to +50 cents over Dec futures.** As we begin purchasing this cheaper basis commercial wheat, we will unwind the existing spread position. If all goes according to plan, we will still save $7MM on the commercial cost of wheat vs where it was a few weeks ago as well as make $2-3MM on reversing out of the Dec/Mar wheat spread.

(emphasis added).

37.     Upon standing for delivery of CBOT December 2011 wheat contracts, the shipping certificates that Kraft received were all for wheat located in warehouses on the Mississippi River, which are outside the Toledo region and are not required to transport wheat to Toledo by rail. To take delivery, Kraft had to arrange for the wheat to be barged to a location where it could be transferred to rail, and then shipped to the Mill. These shipping arrangements significantly increased Kraft's costs by approximately $1.21 per bushel.

38.     Ultimately, Kraft took delivery of 1320 shipping certificates for December 2011 CBOT wheat, or a total of 6.6 million bushels.  It loaded out just 660,000 bushels (132 contracts) of that wheat, which was less than 5% of the wheat position it carried in early December and equivalent to approximately $4 million worth of wheat.  After prices in the cash market declined, Kraft resold 1188 of its December 2011 shipping certificates for $35,725,074.

39.     On December 9, Kraft offset all of its 826 remaining long futures contracts in the market (80% of the open interest), which amounted to 78.3% of the trading volume that day. Kraft did not purchase a similar quantity of wheat in the cash market, which would be expected if it had really needed that wheat for its operations.

40.     Kraft's actions proximately caused cash wheat prices in Toledo to decline and the December 2011/March 2012 wheat futures spread to narrow, which was favorable to Kraft.  In particular, December 11 wheat futures prices increased from $5.75 as of November 28, 2011 to $6.12 as of December 2, 2011.  Cash wheat prices in Toledo declined from $6.16 per bushel as of December 2, 2011 to $5.86 per bushel as of December 9, 2011.  As a result of these price shifts, Kraft earned over $5.4 million in profits.

## C.     Kraft Violated Speculative Position Limits

41.     During the relevant time, the Commission specified the position limit levels for wheat futures.  70 Fed.Reg. 24705, 24707, *Revision of Federal Speculative Position Limits* (CFTC May 11, 2005).  It published those levels in Commission Regulation 150.2, 17 C.F.R. § 150.2 (2011), which provided that no person may hold or control a net long or net short position for the purchase or sale of wheat for future delivery traded on the CBOT in excess of 600 contracts in the spot month, or in excess of 5,000 contracts for any single contract month or 6,500 contracts for all months combined.  These position limits are intended to protect the

futures market from excessive speculation that could cause unreasonable or unwarranted price fluctuations.

42.     Consistent with the Commission, the CBOT adopted speculative position limits for CBOT wheat futures at the Commission-specified levels.  The CBOT position limit scheme for wheat futures included a prohibition against trading in excess of position limits, as set forth in CBOT Rule 14102.E. ("Position Limits, Exemptions, Position Accountability and Reportable Levels"), which referenced harmonized CME/CBOT Rule 559 ("Positon Limits and Exemptions"), which, in turn, provided that the position limit levels applicable to those contracts with position limits are set forth in the "Position Limit, Position Accountability and Reportable Level Table" ("Table") in the Interpretations Section at the end of Chapter 5 of the exchange rules.  During the relevant time, the Table identified a wheat futures spot month level of 600 contracts in the spot month, or in excess of 5,000 contracts for any single contract month or 6,500 contracts for all months combined.

43.     Traders who are *bona fide* hedgers – such as producers or end-users of particular commodities, like Kraft – can apply for exemptions to speculative position limits based on a demonstration of *bona fide* hedging needs.  Requests for hedge exemptions from exchange limits must be submitted to the CME, which reviews the requests and, if approved, issues a letter setting out the specific additional limit it has approved for the entity.  Hedge exemptions are valid for one calendar year and are renewable only through the submission of another application to the CME.

44.     At all times relevant to this Complaint, the CBOT speculative position limit for wheat futures contracts was 600 contracts during the spot month.  Spot month is defined as commencing at the close of business on the business day prior to the first notice day – the day

after which the purchaser of a futures contract may be required to take physical delivery – for any delivery month and terminating at the end of the delivery period. Regulation 151.3, 17 C.F.R. § 151.3 (2011). For the December 2011 wheat contract, the spot month period began on November 29, 2011.

45.     As a commercial end user of flour, Kraft is eligible to seek a hedge exemption to cover its wheat needs. In or about October 2010, Kraft submitted such an application to the CME. On October 22, 2010, it received an exemption approval letter, permitting it to maintain wheat positions in excess of the speculative position limit, effective December 1, 2010. The exemption approval letter noted that "positions in the last five days of trading of any futures contract may not exceed Kraft Foods, Inc.'s unfilled anticipated requirements of the same cash commodity for that month and the next succeeding month."

46.     The exemption approval specifically noted that exemptions must be renewed on an annual basis and that any application by Kraft to renew its exemption must be submitted to the CME by no later than December 1, 2011.

47.     Kraft did not submit a request for renewal of its hedge exemption until December 28, 2011. Consequently, beginning on December 2, Kraft no longer had a CME hedge exemption for the December 2011 wheat contract and it was bound by the 600 contract speculative position limit in that commodity. Kraft also did not request a hedge exemption with the Commission for December 2011.

48.     Kraft did not have a *bona fide* commercial need for the long futures position that it acquired in December 2011 wheat.

49.     Kraft held long positions in December 2011 wheat that exceeded the mandated speculative position limit for wheat on December 2, 5, 6, 7 and 8 by 2,110, 2106, 1,666, 1,226 and 226 contracts respectively.

50.     Kraft also accepted delivery of 1320 December wheat futures contracts between November 30, 2011 and December 7, 2011.

### D.     Kraft Engaged in Fictitious EFP Transactions

51.     Kraft maintains several trading accounts in which it does wheat futures transactions for both long and short hedging purposes.  Kraft's internal computer software cannot distinguish between long and short positions for the same contract month within the same account, so Kraft's practice has been to place its long wheat futures position in one account and its short wheat futures position in a second account to keep track of them.

52.     Beginning in or about 2003 and continuing through January 2014, prior to each of the five annual delivery periods for CBOT wheat, Kraft conducted an off-exchange transaction between the two Kraft accounts carrying the long and short positions whereby Kraft's short position was offset by its long position.  Kraft's finance department determined the price level at which each transaction would be done and communicated that information to wheat procurement staff who directed Kraft's clearing firm to execute the transaction.  Each of the transactions was cleared through the CME as an EFP.

53.     Pursuant to Regulation 1.38(a), 17 C.F.R. § 1.38(a), noncompetitive, off-exchange futures trades are permitted only when they are executed in accordance with the rules of the relevant exchange.

54.     CME Rule 538 and CBOT Rule 538 permit "Exchanges for Related Positions" – of which EFPs are a sub-set – under certain conditions.  EFPs are permissible only if they are between two independent parties and involve a privately negotiated and simultaneous exchange

of a futures position for a corresponding and offsetting cash physical position. EFPs must be cleared and reported to the appropriate exchange and the parties must prepare proper documentation for both parts of the transaction, including the same documentation that would accompany any other sale of a physical commodity.

55.     Kraft controlled both trading accounts involved in these EFP transactions.  Kraft also did not actually transfer physical wheat in connection with any of the EFP transactions, nor did it create any of the documentation that ordinarily accompanies the sale of a physical commodity.  The only documentation for these EFP transactions are the notations of the transfer of the futures position between accounts in Kraft's futures account statements and internal records.  Because they did not involve the actual transfer of physical wheat between two independent parties, Kraft's EFPs were impermissible and violated Regulation 1.38.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

**Violations of Section 6(c)(1) of the Act and Regulation 180.1:
Use of Manipulative or Deceptive Device**

56.     Paragraphs 1 through 55 are realleged and incorporated herein by reference.

57.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1),  makes it unlawful for "any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with …a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." Regulation 180.1 makes it unlawful for "any person, directly or indirectly, in connections with any contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ or attempt to use or employ, any manipulative device, scheme, or

artifice to defraud;… (3) engage, or attempt to engage, in any act practice or course of business, which operates or would operate as a fraud or deceit upon any person…."

58.     Kraft intended to affect or acted recklessly with regards to affecting the prices of the December 2011 wheat futures contract and engaged in overt acts in furtherance of its intent.

59.     By the foregoing conduct, Kraft intentionally or recklessly used or employed or attempted to use or employ a manipulative device or artifice to defraud and engaged in or attempted to engage in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the Act and Regulation 180.1.

60.     Because the actions of Kraft's wheat procurement staff occurred within the scope of their employment, office, or agency with Kraft, Kraft is liable as a principal for their violations of Section 6(c)(1) and Regulation 180.1 pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2014).

61.     Each and every overt action in furtherance of the attempt to manipulate prices, and each act of manipulation is alleged herein as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1.

## COUNT II

### Violations of Section 9(a)(2), 6(c)(3) and Regulation 180.2
### Manipulation and Attempted Manipulation of Wheat Futures and Cash Wheat

62.     Paragraphs 1 through 55 are realleged and incorporated herein by reference.

63.     Section 6(c)(3) of the Act, 7 U.S.C. § 9(3), makes it unlawful for "any person, directly or indirectly, to manipulate or attempts to manipulate the price of any swap or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

64.     Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

65.     Regulation 180.2 makes it "unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."

66.     By the foregoing conduct, Kraft manipulated or attempted to manipulate the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of Sections 6(c)(3) and 9(a)(2) of the Act and Regulation 180.2.

67.     Because the actions of Kraft's wheat procurement staff occurred within the scope of their employment, office, or agency with Kraft, Kraft is liable as a principal for their violations of Sections 6(c)(3) and 9(a)(2) of the Act and Regulation 180.2 pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2014).

68.     Each and every overt action in furtherance of the attempt to manipulate prices, and each act of manipulation is alleged herein as a separate and distinct violation of Section 6(c)(3) and 9(a)(2) of the Act and Regulation 180.2.

## COUNT III

### Violations of Section 4a(b) and (e) of the Act, and Regulation 150.2:
### Speculative Position Limits Violation

69.     Paragraphs 1 through 55 are realleged and incorporated herein by reference.

70.     Section 4a(a) of the Act, 7 U.S.C. § 6a(a), authorizes the Commission to fix such limits on the positions which can be held on futures contracts.  Section 4a(b)(2) of the Act prohibits any person directly or indirectly to control a net long or net short position in any commodity in excess of any position limit fixed by the Commission.  Pursuant to this authority,

the Commission enacted Regulation 150.2, 17 C.F.R. § 150.2 (2011), which, among other things, sets speculative position limits in wheat futures contracts.

71.     Section 4a(e) of the Act, 7 U.S.C. § 6a(e), makes it unlawful for any individual to violate a rule of a contract market or board of trade setting limits on the net number of contracts that may be possessed or controlled by one person or entity if such rule was approved by the Commission.

72.     During the time period covered by this Complaint, the speculative position limit set by the Commission in Regulation 150.2 and by the CME in CBOT Rule 559 for CBOT wheat futures contracts was 600 contracts during the spot month.

73.     By exceeding the limit fixed by Commission Regulation 150.2 and the CBOT rules on December 2, 5, 6, 7, and 8, 2011, Kraft violated Section 4a(b) and (e) of the Act and Regulation 150.2, 17 C.F.R. § 150.2 (2011).

74.     Each date on which Kraft exceeded the speculative position limit for December 2011 wheat constitutes a separate and distinct violation of Section 4a(b) and (e) of the Act and Regulation 150.2.

75.     The acts, omissions, and failures of Kraft's employees, officers and agents set forth in paragraphs 1 through 54, above, occurred within the scope of the employees', officers' and agents' employment, office, or agency with Kraft.  Therefore, Kraft is liable for its employees', officers' and agents' acts, omissions, and failures constituting violations of Section 4a(b) and (e) of the Act, pursuant to Section 2(a)(1)(B) of the Act.

## COUNT IV

**Violations of Sections 4c(a)(1) and (2) of the Act and Regulation 1.38(a):**
**Wash Sales, Fictitious Sales and Noncompetitive Trading**

76.     Paragraphs 1 through 55 are realleged and incorporated herein by reference.

77.     Sections 4c(a)(1) and (2) of the Act, read together, provide, in relevant part, "It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of a transaction . . . involving the purchase or sale of any commodity for future delivery . . . that (A)(i) is, is of the character of, or is commonly known to the trade as, a 'wash sale' or . . . (ii) is a fictitious sale; or (B) is used to cause any price to be reported, registered or recorded that is not a true and bona fide price." 7 U.S.C. § 6c(a)(1) and (2).

78.     Commission Regulation 1.38(a) provides, in relevant part:

*Competitive execution required; exceptions.* All purchases and sales of any commodity for future delivery . . . on or subject to the rules of a contract market shall be executed openly and competitively by open outcry or posting of bids and offers or by other equally open and competitive methods . . . during the regular hours prescribed by the contract market for trading in such commodity . . . *Provided, however*, That this requirement shall not apply to transactions which are executed noncompetitively in accordance with the written rules of the contract market which have been submitted to and approved by the Commission, specifically providing for the noncompetitive execution of such transactions.

79.     CME Rule 538 and CBOT Rule 538 allow noncompetitive EFP transactions only when, among other things, the transactions involve two independent parties, result in the actual transfer of the cash commodity, and are supported by proper documentation.

80.     The off-exchange transactions in which Kraft off-set short and long positions in its own accounts, and which Kraft reported to the CME as EFPs, were not done in accordance with the written rules regarding EFPs of the CME and CBOT because the two sides of the EFP transactions were not independent parties given that Kraft set the price of the transactions, the transactions did not transfer the cash commodity, and Kraft failed to maintain proper documentation of the transactions. Additionally, by engaging in these EFP transactions that were equal and offsetting in price Kraft avoided price competition and any market risk.

Accordingly, these transactions constituted "wash sales" "fictitious sales" and noncompetitive trades in violation of Sections 4c(a)(1) and (2) of the Act and Regulation 1.38.

81.     Section 4c(a) of the Act also makes it unlawful to offer to enter into, enter into, or confirm the execution of a commodity futures transaction that "is used to cause any price to be reported, registered, or recorded that is not a true and bona fide price." 7 U.S.C. § 6c(a) (2012). Where a transaction is non-*bona fide* in violation of Regulation 1.38(a), the price reported for that transaction is also non-*bona fide*.

82.     By entering into futures trades noncompetitively, in violation of Section 4c(a) of the Act and Regulation 1.38(a), and reporting those transactions to the CME or CBOT, Kraft also caused non-*bona fide* prices to be reported or recorded in violation of Section 4c(a)

83.     Each instance in which Kraft engaged in a wash sale, fictitious sale or non-competitive trade, and each instance where Kraft caused non-*bona fide* prices to be reported or recorded as described above from 2009 through January 2014 constitutes a separate and distinct violation of Sections 4c(a)(1) and (2) of the Act and Regulation 1.38.

84.     The acts, omissions, and failures of Kraft's employees, officers and agents set forth in paragraphs 1 through 54, above, occurred within the scope of the employees', officers' and agents' employment, office, or agency with Kraft.  Therefore, Kraft is liable for its employees', officers' and agents' acts, omissions, and failures constituting violations of Section 4c(a) of the Act, pursuant to Section 2(a)(1)(B) of the Act, and Regulation 1.38.

## VI.     RELIEF REQUESTED

WHEREFORE, for the reasons stated above, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.      Enter an order finding Kraft liable for violating Sections 4a(b)(2) and (e), 4c(a), 6(c)(1), 6(c)(3) and 9(a)(2), of the Act, 7 U.S.C. §§ 6a(b)(2) and (e), 6c(a), 9(1), 9(3), and 9(a)(2) (2012); Regulation 150.2, 17 C.F.R. § 150.2 (2011); and Regulations 1.38(a), 180.1, and 180.2, 17 C.F.R. § 1.38(a), 180.1 and 180.2 (2014);

B.      Enter an order of permanent injunction prohibiting Kraft from violating Sections 4a(b)(2) and (e), 4c(a), 6(c)(1), 6(c)(3) and 9(a)(2) of the Act, 7 U.S.C. §§ 6a(b)(2) and (e), 6c(a), 9(1), 9(3) and 9(a)(2) (2012), and Regulations 1.38, 150.2, 180.1, and 180.2, 17 C.F.R. §§ 1.38(a), 150.2, 180.1, and 180.2 (2014);

C.      Enter an order directing Kraft, and any successors thereof, to pay a civil monetary penalty in the amount of not more than the greater of:  (1) triple the monetary gain to Kraft for each violation of the Act; or (2) $1 million for each violation of Section 6(c)(1), 6(c)(3) or 9(a)(2) of the Act, and $140,000 for each additional violation of the Act, plus post-judgment interest;

D.      Enter an order directing Kraft to disgorge all benefits derived, directly or indirectly, from acts or practices that constitute violations of the Act and Regulations, including pre- and post-judgment interest;

E.      Enter an order requiring Kraft, and any successors thereof, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

F.      Enter an order providing such other remedial ancillary relief as the Court may deem necessary and appropriate under the circumstances.

Date: April 1, 2015

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF U.S.
COMMODITY FUTURES TRADING
COMMISSION

_/s/ Jennifer E. Smiley_____
Jennifer E. Smiley
Robert Howell
Susan Gradman
Rosemary Hollinger
U.S. Commodity Futures Trading Commission
Division of Enforcement
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0530 (Smiley)
(312) 596-0590 (Howell)
jsmiley@cftc.gov
rhowell@cftc.gov