# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

U.S. Commodity Futures
Trading Commission,

        Plaintiff,

        v.

Kraft Foods Group, Inc., and
Mondelēz Global LLC,

        Defendants.

Case No. 15 C 2881

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This matter concerns the alleged misconduct of Defendant Kraft in purchasing and selling wheat and wheat futures. Plaintiff, the Commodity Futures Trading Commission ("CFTC"), brought this action pursuant to 7 U.S.C. § 13a-1, and alleges four causes of action: (I) use of a manipulative or deceptive device in connection with a contract for sale of a commodity or future, in violation of Section 6(c)(1) of the Commodities Exchange Act (the "Act"), and CFTC Regulation 180.1; (II) manipulation and attempted manipulation of the price of cash wheat and wheat futures in violation of Sections 9(a)(2) and 6(c)(3) of the Act, and CFTC Regulation 180.2; (III) exceeding the speculative position limit with regard to wheat futures in violation of Sections 4a(b) and (e) of the Act, and CFTC Regulation 150.2; and (IV) wash sales, fictitious sales and noncompetitive trading in violation of Sections 4c(a)(1) and (2) of the Act, and CFTC Regulation 1.38(a). [1] Cmplt. Defendants moved to dismiss Counts I and II of the Complaint. [56]. For the reasons explained below, that motion is denied.

# I. Background[1]

The Defendants are Kraft Foods Group, Inc. ("Kraft") and Mondelēz Global LLC ("Mondelēz"). Kraft is one of North America's largest consumer packaged food and beverage companies, and operated the snack food business that is the subject of this Complaint. [1] at ¶¶ 8, 10. During the time period covered by this Complaint, Kraft Foods Inc. owned Kraft. *Id*. at ¶10. Through a spin-off agreement in which Kraft Foods Inc. altered its corporate structure, Defendant Mondelēz came to operate the snack food business formerly operated by Kraft. *Id*. In the same spin-off, Kraft Foods Inc. became Mondelēz International Inc., which now owns Defendant Mondelēz Global. The Court's discussion concerns primarily Kraft, not Mondelēz, because Kraft operated the snack food business during the relevant time period.

Kraft is one of the largest domestic users of #2 Soft Red Winter Wheat. [1] at ¶ 11. It is this type of wheat, and its futures contracts, which are at issue in this matter. Kraft consumes approximately 30 million bushels of wheat per year, 90 percent of which is milled into flour at its Toledo, Ohio flour mill (the "Mill"). *Id*. at ¶¶ 11, 14. Kraft can store five million bushels of unprocessed wheat at the Mill. *Id*. Kraft uses that wheat in the production of snack foods, including Oreo, Ritz, Triscuit, Wheat Thins, and Chips Ahoy! *Id*. at ¶ 11. Kraft typically purchases wheat on a daily basis throughout the year and strives to maintain a two-month supply in its inventory. *Id*. at ¶ 14.

---

[1] The Background Section is based upon the well-pleaded factual allegations of the Complaint [1] and the related documents properly before this Court. The facts are accepted as true solely for the purpose of this motion.

To make flour that it can use in snack food production, Kraft requires wheat for milling that meets certain specifications for baking and human consumption. *Id*. at ¶ 12. These specifications include the permissible numbers of insect damaged kernels and maximum allowable levels of vomitoxin. *Id*. Vomitoxin is a type of mold that may be produced in wheat infected by Fusarium head blight or scab. *Id*. U.S. Food and Drug Administration guidance requires a vomitoxin level below one part per million in finished baked goods. *Id*. Vomitoxin levels in wheat can be reduced through normal wheat milling processes and cleaning technologies, or by blending in wheat with lower vomitoxin levels. *Id*.

According to Plaintiff, Kraft has two primary options for obtaining the wheat it requires. *Id*. at ¶ 15. First, it can buy the wheat directly from a grain producer or wholesaler in the cash market. *Id*. Second, it can purchase wheat futures contracts sold on the Chicago Board of Trade ("CBOT"). *Id*. at ¶ 17. When Kraft sources through the cash market, it can negotiate wheat specifications to ensure that the wheat meets its requirements. *Id*. at ¶ 15. It can also negotiate the delivery location and process. *Id*. at ¶ 16. For instance, Kraft ordinarily will source its cash market wheat from the Toledo region – which includes Ohio, Indiana, Michigan and Ontario. *Id*. It is not economical for Kraft to take delivery of wheat located outside this region, including wheat housed along the Mississippi River, because of significantly increased shipping costs. *Id*. Costs of wheat housed outside of the Toledo region are higher because Kraft would have to pay for the wheat to be barged to a location where it could be transferred to rail and then sent on to the

Mill. *Id.* It is not possible for Kraft to barge wheat directly from locations down the Mississippi River to the Mill. *Id.*

As for the second option, Kraft rarely takes delivery of wheat purchased through futures contract for delivery via the CBOT process. *Id.* at ¶ 22. A futures contract is a standardized agreement between two parties to purchase or sell a predetermined quantity of a commodity for delivery during a future month, at a price determined at the initiation of the contract. *Id.* at ¶ 18. For instance, the buyer would agree to pay $50 dollars for 1 bushel of wheat on the day the contract is executed, and the seller would agree to deliver that wheat on an agreed future date. The trader who purchases the commodity is said to have a "long" position, while the trader who sells the commodity has a "short" position. *Id.* Futures contracts may be settled in two ways: (1) by delivering the actual commodity on the date specified; or (2) by "offsetting" the contract by entering an equal and opposite trade, effectively eliminating the original position. *Id.* For example, a party would "offset" a long contract for 500 bushels of wheat by purchasing a short contract for 500 bushels.

CBOT Rules govern trading on the Chicago Board of Trade. Under CBOT Rules, each wheat futures contract consists of 5,000 bushels of wheat and the contracts are set for delivery during five different contract months each calendar year: March, May, July, September, and December. *Id.* at ¶ 19. A futures seller delivers a CBOT wheat contract by tendering a "shipping certificate" to the buyer of the futures contract. *Id.* That certificate represents an interest in wheat for load-

out from a CBOT-approved delivery facility. *Id*. Shipping certificates may also be bought and sold between traders or exchanged for futures positions. *Id*.

Wheat acquired via the futures market is typically of a lower quality than wheat from the cash market. *Id*. at ¶ 20. For example, during the relevant time period, CBOT rules specified that futures wheat from the exchange could have vomitoxin levels of up to 4 parts per million, four times the maximum amount recommended by the FDA for baked goods. *Id*. at ¶¶ 12, 20. Further, parties who take delivery of CBOT wheat cannot specify delivery location or load out process, nor do they even know the delivery locations for the contracts they have purchased until they receive shipping certificates. *Id*. at ¶ 21.

Because of the inability to control wheat quality or delivery location, Kraft rarely takes delivery of wheat via the CBOT delivery process and, prior to Fall 2011, had last done so in 2002. *Id*. at ¶¶ 22, 23. Instead, Kraft normally uses the futures markets to hedge its cash wheat purchases, taking long futures positions that roughly correlate with its actual wheat needs, and then offsetting these positions as it acquires physical wheat in the cash market. *Id*. The idea behind this approach is to secure a stable supply of wheat in case there are market fluctuations.

In 2011, cash wheat prices for #2 Soft Red Winter Wheat in the Toledo region rose from $5.74 per bushel on June 30, 2011 to $7.72 per bushel on August 26, 2011. *Id*. at ¶ 24. Over the same time, the price of December 2011 CBOT wheat futures rose from $6.57½ to $7.97. *Id*. Even though cash wheat prices were rising, there was wheat available in the Toledo cash market for Kraft to satisfy its needs. *Id*.

Plaintiff alleges that, in response to these elevated cash prices, Kraft deviated from its practice of using the futures markets solely to hedge its cash wheat purchases. *Id*. at ¶ 25. Instead, Kraft attempted to leverage its status as a large commercial hedger to lower the price of cash wheat. *Id*. at ¶ 34. According to the Complaint, Kraft "wheat procurement staff developed, and Kraft senior management approved, a strategy to use its status as a commercial hedger to acquire a huge long position in December 2011 wheat futures in order to induce sellers to believe that Kraft would take delivery, load out, and use that wheat in its Mill." *Id*. at ¶ 25. In developing that strategy, Plaintiff's claim that Kraft intended that the market would react to its enormous long position by increasing the price of the December 2011 futures contract and lowering the price of cash wheat available in the Toledo region. *Id*. at ¶ 34.

According to Plaintiff, Kraft executed a "trial run" of this strategy in September 2011, taking delivery of 250,000 bushels of CBOT wheat, which constituted fifty total certificates. *Id*. at ¶ 27. Thirty-one of the fifty certificates were for wheat located on the Mississippi River. *Id*. Kraft could not transport this wheat to the Mill upriver via barge and, due to exchange rules, Kraft could not require that the wheat be loaded directly on to rail transport. *Id*. This meant that two separate modes of transport were needed to get the wheat to the Mill. *Id*. As a result of their test run, Plaintiff claims that Kraft knew it could not assume that CBOT wheat would be easily transportable to the Mill. *Id*. Around the same time as the "trial run," Kraft submitted a public comment to the CFTC requesting that

the CBOT require wheat delivery facilities be connected to rail service. *Id.* at ¶ 28. Kraft's position was not adopted. *Id.*

Plaintiff alleges that in October 2011, despite the results of its trial run, Kraft wheat procurement staff proposed to Kraft senior management a strategy of buying $90 million of December 2011 wheat futures in order to depress the price of cash wheat and inflate the price of futures wheat. *Id.* at ¶ 29. In an October 20, 2011 email to Kraft's Chief Financial Officer and other senior management, the Kraft Senior Director of Global Procurement explained the strategy as follows:

> Given our proposal to 'take physical delivery in Dec' of 15 mm bushels at 50 cents per bushel below the commercially offered price results in the savings of $7mm+. In addition, there is a key market dynamic that is important to understand: Once the market sees that Kraft is 'stopping' December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft. We will then have the option of redelivering the wheat acquired through the futures market. This will then quickly reverse the negative cash flow impact. *Id.* at ¶ 30.

In considering this proposal, Kraft senior management required that the futures position not exceed $50 million by the end of December, so Kraft procurement staff agreed to sell at least $40 million of the proposed $90 million position by the end of the month. *Id.* at ¶ 31. Kraft senior management then approved the proposal to buy $90 million of December 2011 wheat futures. *Id.*

Kraft, according to Plaintiff, did not have a bona fide commercial need for $90 million of wheat – which would have amounted to about 15 million bushels, or a six-month supply for the Mill. *Id.* at ¶ 32. Kraft had never before possessed that amount of wheat and its wheat storage facility at the Mill, which could accommodate only 5 million bushels, was already more than 80% full. *Id.* at ¶¶ 14,

32-33. To take delivery of 15 million additional bushels of wheat, Kraft would have had to locate additional storage and pay additional costs of approximately five cents per bushel for nearly all of the 15 million bushels for up to six months. *Id*. at ¶ 33. Kraft also would have had to pay additional shipping costs for any wheat coming from the Mississippi River area, including transport by rail and barge. *Id*. at ¶ 27. In addition, in order to use CBOT wheat to create flour that met its baking specifications, Kraft would have had to buy and store higher quality wheat from the cash market to blend with the lower-quality CBOT wheat. *Id*. To do that, Kraft would have needed to locate and pay storage costs for far in excess of 15 million bushels. *Id*. Thus, according to Plaintiff, Kraft did not really intend to take delivery of the 15 million bushels of wheat. *Id*. at ¶ 34. Kraft intended for the market to react to its huge long position, which was an indication that Kraft's demand for December wheat was being met through the futures market, by lowering the price of cash wheat due to the lack of demand from Kraft. *Id*. This would later allow Kraft to obtain wheat in the cash market at lower prices. *Id*.

Kraft wheat procurement employees executed the strategy as planned, ultimately accumulating 3,150 long December 2011 wheat futures contracts by November 29, 2011, the first day of the delivery period. *Id* at ¶ 35. Kraft's position was equivalent to 15.75 million bushels, or approximately $93.5 million of wheat. *Id*. at ¶ 35. Kraft's position exceeded the speculative position limit set by the CBOT of 600 contracts. *Id*. at ¶ 44. Specifically, on December 2, 5, 6, 7 and 8, Kraft exceeded the position limits by 2,110, 2106, 1,666, 1,226 and 226 contracts,

respectively. *Id.* at ¶ 49. As of December 7, 2011, Kraft's long position constituted

87% percent of the CBOT December 2011 wheat futures open interest. *Id.*

A December 2, 2011 email between the Kraft Senior Director of Global

Procurement and Kraft senior management explained the result of the strategy:

> "As you may recall, we established a long Dec Wheat/Short March Wheat spread at 35 cents (Mar premium to Dec) for the purpose of taking delivery of CME wheat, representing a $7MM+ saving over commercially sourced wheat. Since Monday we have "stopped" 2.2MM bushels of wheat at a cost of $13.2MM. As expected, the Dec/Mar spread has narrowed to app[roximately] 11 cents resulting in a marked to market gain of $3.6MM on our open spread position. Meanwhile, with the narrowing spread, the cash wheat basis has declined from +80 cents to +50 cents over Dec futures. As we begin purchasing this cheaper basis commercial wheat, we will unwind the existing spread position. If all goes according to plan, we will still save $7MM on the commercial cost of wheat vs where it was a few weeks ago as well as make $2-3MM on reversing out of the Dec/Mar wheat spread." *Id.* at ¶ 36.

Ultimately, Kraft obtained 1,320 shipping certificates for December 2011 CBOT

wheat, which represented a total of 6.6 million bushels. *Id.* at ¶ 38. However, the

shipping certificates that it received were all for wheat located in warehouses on the

Mississippi River, which would have cost $1.21 per bushel to transport to the Mill.

*Id.* at ¶ 37. Kraft ultimately took delivery of just 660,000 bushels (132 contracts) of

that wheat, which was less than 5% of the wheat position it carried in early

December. *Id.* After prices in the cash market fell, Kraft resold 1188 of its

December 2011 shipping certificates for $35,725,074. *Id.* On December 9, 2011,

Kraft offset all of its 826 remaining long futures contracts (80% of the open

interest), which amounted to 78.3% of the trading volume that day. *Id.* ¶ 39. The

Plaintiff claims that it is telling of Kraft's improper motive that it did not purchase

a similar quantity of wheat in the cash market as it had previously purchased in the

December 2011 futures market. *Id*. According to Plaintiff, if Kraft had really needed all of the $90 million in futures wheat for its operations, it would have bought the same amount of wheat on the cash market. *Id*. at ¶ 39.

Plaintiff claims that, as a result of Kraft's actions, the December 2011 wheat futures prices increased from $5.75 on November 28, 2011 to $6.12 on December 2, 2011. *Id*. at ¶ 40. Cash wheat prices in Toledo declined from $6.16 per bushel on December 2, 2011 to $5.86 per bushel on December 9, 2011. *Id*. These price shifts resulted in Kraft pocketing over $5.4 million in profits. *Id*.

## II.    Legal Standard

Under Rule 12(b)(6), the Court must construe the Complaint in the light most favorable to the Plaintiff, accept as true all well-pleaded facts and draw reasonable inferences in its favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Statements of law, however, need not be accepted as true. *Yeftich*, 722 F.3d at 915. Rule 12(b)(6) limits this Court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). To survive a motion under Rule 12(b)(6), the Complaint must "state a claim to relief that is plausible on its face." *Yeftich*, 722 F.3d at 915. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Additionally, arguments concerning the adequacy of the evidence, or based on unsupported factual assertions not found in the Complaint, are not properly resolved on a motion to dismiss. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012) (Rule 12(b)(6) motion must be decided only on the complaint itself and information that is subject to proper judicial notice); *Corbett v. White*, 00 C 4661, 2001 WL 1098054, at *3 (N.D. Ill. Sept. 17, 2001) ("purpose of motion to dismiss is to test the sufficiency of the complaint, not to decide its merits"). This is especially true where those arguments are directly contradicted by allegations in the Complaint. To the extent any of Defendants' arguments suffer from those flaws, they will not be considered here.

Finally, the parties dispute whether Count I must be pled with the particularity required of a fraud claim under Federal Rule of Civil Procedure 9(b). *See* [57] at 10; [64] at 12-13. That issue is addressed below in the section concerning Count I.

## III. Analysis

### A. Overview of Relevant Law

At issue in the present motion are Plaintiff's two manipulation based causes of action, Counts I and II. Because there are multiple sections of the Act that prohibit manipulation, and the differences between those sections are crucial to the Court's analysis, it is useful to first examine the provisions themselves and their

relation to one another. The provisions at issue break down into two groups, which also map the Complaint's organization: (1) Count I alleges violations of the new prohibitions of manipulation (which are Section 6(c)(1) and Regulation 180.1); and (2) Count II alleges violations of the old prohibitions of manipulation (which are Sections 9(a)(2) and 6(c)(3), along with Regulation 180.2).

Section 9(a)(2) has long been a part of the Act, and makes it a violation for any "person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to corner or attempt to corner any such commodity." 7 U.S.C. § 13(a)(2).[2]

Section 6(c)(3)'s operative language also has long been part of the Act, and that section makes it unlawful for "any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 9(3). While Section 6(c)(3) was created as part of the 2010 Dodd-Frank amendments to the Act, its operative language was taken from the version of Section 6(c) existing before those amendments. Regulation 180.2 was passed following the passage of Dodd-Frank, and also mirrors the pre-amendment version of 6(c). *See* 17 C.F.R. § 180.2. Regulation 180.2 is titled "Prohibition on price manipulation," and reads: it "shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity

---

[2] Note that this Opinion refers to the sections of the CEA by their CEA section cite, but will use the U.S. Code for purposes of citation. For instance, Section 6(c)(1) of the CEA is located at 7 U.S.C. § 9(1).

in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 17 C.F.R. § 180.2.

In applying Regulation 180.2, the Commission has stated that "it will be guided by the traditional four-part test for manipulation that has developed in case law arising under 6(c) and 9(a)(2)." *Final Rule: Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41,398, 41,407 (July 14, 2011). The four part test mentioned by the Commission was developed in case law construing Section 9(a)(2) and the pre Dodd-Frank version of Section 6(c), *see In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1045 (N.D. Ill. 1995), which did not include the newly added Section 6(c)(1) language. *See* 7 U.S.C. § 9 (2009).

The new manipulation provisions, Section 6(c)(1) and Regulation 180.1, were added to the Act through the 2010 Dodd-Frank Amendments and subsequent CFTC regulation. *See* Pub. L. No. 111-203, July 21, 2010, 124 Stat 1376; 17 C.F.R. § 180.1. Section 6(c)(1) makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of" Commission regulations." 7 U.S.C. § 9(1). This new authority was intended to "augment the Commission's existing authority to prohibit fraud and manipulation" under Section 9(a)(2). *Final Rule*, 76 Fed. Reg. at 41,401. Regulation 180.1, enacted pursuant to Section 6(c)(1), further explains that

under Section 6(c)(1) it is unlawful for "any person, directly or indirectly, in connections with any contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; . . . (3) engage, or attempt to engage, in any act practice or course of business, which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 180.1. In publishing Regulation 180.1, the CFTC explained that "Final Rule 180.1 prohibits fraud and fraud-based manipulations." *Final Rule*, 76 Fed. Reg. at 41,400.

There is no indication, in case law or elsewhere, that these new manipulation provisions – Section 6(c)(1) and Regulation 180.1 – are governed by the same four part test that applies in cases under Section 6(c)(3) and Section 9(a)(2).

### B. Count I: Violation of Section 6(c)(1) and Regulation 180.1

In Count I, Plaintiff alleges that Defendants violated Section 6(c)(1) of the Act and its implementing regulation, Regulation 180.1. [1] at ¶¶ 56-61. Plaintiff claims that Defendants did so by purchasing a huge wheat futures position without intending to take delivery, but rather with the intent that its futures position would cause wheat futures prices to rise while also causing cash wheat prices to fall. Defendants move to dismiss Count I asserting that Plaintiff did not adequately plead a claim under Section 6(c)(1) and Regulation 180.1. Before addressing the merits of this argument, the Court must first determine the applicable pleading standard.

### i. The Applicable Pleading Standard for Count I

In their motion, Defendants claim that Count I must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because Count I concerns the violation of an anti-fraud rule. [57] at 10. Plaintiff disagrees, arguing that not all claims under Section 6(c)(1) and Regulation 180.1 sound in fraud. [64] at 12. Section 6(c)(1) prohibits the use of any "any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." 7 U.S.C. § 9(1). Under Regulation 180.1, the Commission explained that it is unlawful under Section 6(c)(1) to use "any manipulative device, scheme, or artifice to defraud." 17 C.F.R. § 180.1. Because those provisions were drafted with the disjunctive "or," Plaintiff claims that they create two separate causes of action, one for manipulation and one for fraud. [64] at 12-14. Specifically, Plaintiff argues that there can be claims for "manipulation" only, and that such claims do not require any showing of fraudulent conduct. *Id.* As the parties acknowledge, the interpretation of these sections is an issue of first impression. *See* [57] at 2; [64] at 9. The Court thus turns to the language and history of the statute and regulation, along with the judicial interpretation of similar statutes and regulations.

The cardinal canon of statutory interpretation is that the Court looks first to the text of the statute. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010). When a statute is unambiguous, the Court's inquiry starts and stops at the text. *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636, 659 (7th Cir. 2014). Here, because the language of Section 6(c)(1) only prohibits the use of manipulative or

deceptive devices or contrivances ***in contravention of the regulations*** promulgated by the Commission, the Court must interpret Section 6(c)(1) and Regulation 180.1 together. Upon review of the relevant language, the Court finds those provisions are intended to reach only fraudulent conduct. The only reasonable understanding of the phrase "any manipulative device, scheme, or artifice to defraud" is that the Act prohibits: (1) the use of manipulative devices to defraud; (2) the use of schemes to defraud; and (3) the use artifices to defraud. The only possible alternative interpretation, and indeed the only interpretation that would remove the fraud requirement, would be that Section 6(c)(1) prohibits: (1) the use of manipulative devices; (2) the use of schemes; and (3) the use of artifices to defraud. Such an interpretation would be unreasonable, as the vast majority of law abiding participants in the commodities markets engage in "schemes" of one type or another. A scheme is simply a "systemic plan; a connected or orderly arrangement." SCHEME, Black's Law Dictionary (10th ed. 2014). Thus, a commodities based scheme could be something as simple as "buy low, sell high," trading based on market trend lines, or any other plan for trading aimed at profit making. The Court finds that an interpretation prohibiting such activity would be absurd, and declines to adopt that reading of the text. *United States v. Vance*, 764 F.3d 667, 676 (7th Cir. 2014) *cert. denied*, 135 S. Ct. 1464 (2015) (no "rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences"). Instead, the Court finds that the Section 6(c)(1) and Regulation 180.1 provide a cause of action that sounds in fraud.

This Court's plain reading of the text finds support in an analysis of the nearly identical provisions enacted as part of the Securities Exchange Act of 1934 – Section 10(b) and Rule 10b-5.  15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.  Both Section 6(c)(1) of the CEA and Section 10(b) of the Exchange Act prohibit the use of "any manipulative or deceptive device or contrivance" in contravention of the regulations established by their respective agencies.  *See* 7 U.S.C. § 9(c)(1); 15 U.S.C. § 78j.  Likewise, CFTC Regulation 180.1 clarifies that Section 6(c)(1) prohibits the use of "any manipulative device, scheme, or artifice to defraud," and SEC Rule 10b-5 explains that Section 10(b) forbids the use of "any device, scheme, or artifice to defraud."  *See* 17 C.F.R. § 180.1; 17 C.F.R. § 240.10b-5.  When Congress borrows specific terms of art or legal phrasing (as it did in drafting Section 6(c)(1)), a presumption may arise that Congress "knows and adopts the cluster of ideas that were attached to each borrowed word."  *Morissette v. United States*, 342 U.S. 246, 263 (1952); *United States v. Johnson*, 376 F.3d 689, 693 (7th Cir. 2004) ("when Congress utilizes a common law term or a legal term with an established meaning, the courts should apply the accepted definition absent a clear indication to the contrary").  In this instance, neither the operative language, nor its context, gives any "clear indication" to contravene this Court's presumption, and thus, case law interpreting Section 10(b) and Rule 10b-5 remains instructive here.[3]

---

[3] Indeed, the Court's interpretation finds clear support in the legislative remarks of Senator Cantwell when introducing the amendment that would later become Section 6(c)(1), and in the relevant CFTC regulations.  Specifically, the Senator stated that this "legislation tracks the Securities [Exchange] Act in part because Federal case law is clear that when the Congress uses language identical to that used in another statute, Congress intended for the courts and the Commission to interpret the new authority in a similar manner, and Congress has made sure that its intention is clear."  156 Cong. Rec. S3333-01.  In promulgating Regulation 180.1, the CFTC also

Based upon the plain language of the Act and Regulation 180.1, along with a comparison of those provisions to the well-established reading of the Securities Exchange Act of 1934, this Court finds that Section 6(c)(1) and Regulation 180.1 prohibit only fraudulent conduct. For many years now, federal courts interpreting Section 10(b) and Rule 10b-5 have routinely found that those provisions create a cause of action that must sound in fraud. According to the Supreme Court, "Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud." *Chiarella v. U.S.*, 445 U.S. 222, 234-45 (1980); *Dirks v. SEC*, 463 U.S. 646, 667 n. 27 (1983) ("to constitute a violation of Rule 10b–5, there must be fraud"). With regard to securities manipulation, similar to the type of misconduct alleged here, the Supreme Court explained that the word "manipulative" connotes "intentional or willful conduct designed to **deceive or defraud** investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (emphasis added). Put otherwise, manipulation refers generally to practices "that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *see also Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 865 (7th Cir. 1995) ("most forms of 'manipulation' involve deception in one form or another"); *Final Rule*, 76 Fed. Reg. at 41,400 (CFTC confirmed this Court's reading when it finalized Regulation 180.1

---

explained that it intended "to model final Rule 180.1 on SEC Rule 10b-5." *Final Rule*, 76 Fed. Reg. at 41,399. The CFTC explained that "the Commission will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5," and that "by modeling final Rule 180.1 on SEC Rule 10b–5, the Commission takes an important step toward harmonization of regulation of the commodities, commodities futures, swaps and securities markets given that new CEA section 6(c)(1) and Exchange Act Section 10(b) include virtually identical prohibitions against 'any manipulative or deceptive device or contrivance.'" *Id.* at 41,399, 41,399 n. 11.

and explained that "Rule 180.1 prohibits fraud and ***fraud-based manipulations***"). (emphasis added).

Plaintiff's arguments to the contrary are unavailing. First, Plaintiff argues that because Section 6(c)(1) prohibits devices that are "manipulative" ***or*** "deceptive," there must be two distinct types of conduct barred by that Section. Plaintiff thus claims that Section 6(c)(1) prohibits conduct that is manipulative only (without any showing of deception or other type of fraud), and also conduct that is fraudulent. The Supreme Court, however, directly contradicts Plaintiff's awkward construction in its cases analyzing Section 10(b) and Rule 10b-5. Those decisions find that claims of manipulation must involve "conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Hochfelder*, 425 U.S. at 199. As noted above, the CFTC itself noted that Regulation 180.1 prohibited "fraud and fraud-based manipulations." *Final Rule*, 76 Fed. Reg. at 41,400. The Court agrees, and finds that the statute here prohibits only fraudulent manipulations, that is, those involving deception, misrepresentation, or other form of fraud.

Second, the Plaintiff hopes to avoid the requisite fraud component for manipulation claims by misplacing reliance upon cases interpreting Section 9(a)(2). In light of the material differences in the statutory text, however, Section 6(c)(1) and 9(a)(2) are not analogous in this regard. Section 6(c)(1), as clarified by Regulation 180.1, prohibits the use of "any manipulative device, scheme, or artifice to defraud." 17 C.F.R. § 180.1. Section 9(a)(2), on the other hand, makes it

unlawful for any "person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to corner or attempt to corner any such commodity." 7 U.S.C. § 13(a)(2). As set out above, Section 6(c)(1) is nearly identical to the text of Section 10(b) of the Exchange Act. In contrast, 6(c)(1) and Section 9(a)(2) – apart from the fact that both proscribe some form of manipulation – do not share a common text or contextual background. Quite simply, Section 6(c)(1) contains explicit language requiring fraud, and Section 9(a)(2) does not.

Employing Section 9(a)(2) case law without distinction in interpreting Section 6(c)(1), as Plaintiff suggests, would also result in creating two essentially identical and redundant causes of action, thus undermining the CFTC's goal that the new Section 6(c)(1) *augment* Section 9(a)(2). *McClain v. Retail Food Employers Joint Pension Plan*, 413 F.3d 582, 587 (7th Cir. 2005) (it "is an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative, superfluous, or meaningless") (internal quotations and citations omitted). Given the plain meaning of the operative text, the Court declines to take such an approach.[4]

Having determined that Section 6(c)(1) should be interpreted in line with Section 10(b), the Court must therefore ascertain the relevant pleading

---

[4]In line with this Court's statutory interpretation, the CFTC explicitly stated that it intended to model Regulation 180.1 after Rule 10b-5, and that it would be guided by case law interpreting Section 10(b) and 10b-5. It said nothing of the sort concerning Section 9(a)(2). In fact, it stated that the Dodd-Frank amendments enacting Section 6(c)(1) did not affect the applicability of Section 9(a)(2), but instead that "Section 6(c)(1) and final Rule 180.1 augment the Commission's existing authority to prohibit fraud and manipulation." 76 Fed. Reg. at 41,401. As such, Section 6(c)(1) can be seen as a new source of anti-manipulation authority that was separate from, and in addition to, Section 9(a)(2)'s authority.

requirements. Courts within this District have followed the traditional rule that any allegations of "fraud under Rule 10b-5 must satisfy the requirements of Federal Rule of Civil Procedures 9(b) to survive a motion to dismiss." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280–81 (7th Cir. 1996) ("Pleading fraud with specificity is both an element of the SEC Rule 10b-5 cause of action and a pleading requirement of the Federal Rules"); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1251 (N.D. Ill. 1997); *Lane v. Money Masters, Inc.*, No. 14 CV 1715, 2015 WL 225427, at *8 (N.D. Ill. Jan. 15, 2015). The same pleading requirements apply to fraud allegations generally. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (noting that a "claim that sounds in fraud" can implicate "Rule 9(b)'s heightened pleading requirements"). As explained above, the cause of action stated in Count I sounds in fraud. This is affirmed by the facts alleged by Plaintiff here, which claim that the Defendant intentionally deceived the market as to the supply and demand for wheat futures and cash wheat. As such, the Court finds that Count I must be pled with specificity as required under Fed. R. Civ. P. 9(b).

It is important to note, however, that the exact pleading requirements for a cause of action under Section 10(b) vary depending on the type of claim alleged. For example, under Section 10(b), the available causes of action include: (1) fraud by misrepresentation or omission, *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005); and (2) fraudulent manipulation (*i.e.*, deceiving investors by artificially affecting the price of securities). *DH2, Inc. v. Athanassiades*, 404 F. Supp. 2d 1083, 1092 (N.D. Ill. 2005). In this way, certain fraud claims may involve false

statements or omissions, and other fraud claims may involve fraudulent manipulation or misconduct in the marketplace. For instance, in order to state a fraud claim under Rule 10b-5 based upon a misstatement, a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of security; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation. *Dura Pharm.*, 544 U.S. at 341. In contrast, federal courts have adopted a different pleading standard with regard to claims for fraudulent manipulation because those claims often do not involve any specific misstatement. Instead, the defendants – as alleged here – simply mislead or cheat the market through their actions, rather than through their representations.

While the Seventh Circuit has not yet directly addressed the issue, several courts have adopted pleading standards for fraudulent manipulation claims that flow from the Supreme Court's view that manipulation is "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Hochfelder*, 425 U.S. 185, 199 (1976). For example, in *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101-102 (2nd Cir. 2007), the Second Circuit explained the pleading requirements as follows:

> Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b) . . . A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim. . . . Accordingly, a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants. . . . This test will be satisfied if the complaint sets forth, to the extent possible, *what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the*

*market for the securities at issue*. . . . This standard meets the goals of Rule 9(b) while also considering which specific facts a plaintiff alleging manipulation can realistically plead at this stage of the litigation.

*Id*. (internal quotations and citations omitted) (emphasis added).

The trial court in *DH2, Inc. v. Athanassiades*, 404 F. Supp. 2d 1083 (N.D. Ill. 2005) adopted a similar test. There, the court explained that the "gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id*. at 1092 (internal quotations omitted). As such, it required that the plaintiff allege "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *Id*.

This Court finds *ATSI* and *DH2* persuasive, and adopts the pleading requirements articulated in those cases. To plead manipulative conduct, the Plaintiff here must plead what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the commodities at issue. *ATSI*, 493 F.3d at 101-102. The exact state of mind required to be plead will be discussed in greater detail below.

## ii. Manipulative Conduct

Defendants argue that the "CFTC is unable to identify" and allege with the "particularity required for a fraud charge, what 'manipulative or deceptive device or contrivance' Kraft allegedly employed." [57] at 10. The Court disagrees, and finds

that the Plaintiff has adequately pled each of the following: (1) the manipulative acts that were performed; (2) which defendants performed them; (3) when the manipulative acts were performed; and (4) what effect the scheme had on the market for the commodities at issue. Based upon the complaint, there is little dispute between the parties in this case as to the second or third prongs of the pleading standard (who manipulated and when).[5]

Instead, Defendants focus on the first and fourth prongs and argue that Plaintiff has not pled with any degree of particularity "how" Kraft engaged in manipulative or deceptive conduct. [57] at 14-17. As the Supreme Court explained, however, the term manipulation connotes "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Hochfelder*, 425 U.S. at 199. The Complaint here contains detailed allegations of just such misconduct.

Specifically, Plaintiff alleges that Kraft concocted and implemented a scheme to manipulate the price of December 2011 wheat futures and cash wheat by purchasing a huge position in December 2011 wheat futures (over 87% of open interest). [1] at ¶ 35. Pursuant to that scheme, Kraft adopted a strategy of buying $90 million of December 2011 wheat future in early December 2011 to depress the price of wheat in the cash market and inflate the price of wheat futures. *Id*. at ¶ 29.

---

[5] As to the second and third prongs, Plaintiff's allegations are sufficient. With regard to the second prong, Plaintiff alleges that the manipulative acts were performed by the Senior Director of Global Procurement and the Associate Director of Procurement, with the consent of the Kraft CFO and senior management. As to the third prong, the alleged manipulative acts were performed during November and December 2011 – with all futures position having been acquired by November 29, 2011 and all futures positions unwound on December 9, 2011. *Id*. at ¶¶ 25, 38-39.

The Senior Director of Global procurement emailed Kraft's CFO and other senior management on October 20, 2011 to explain the strategy, stating that "there is a key market dynamic that is important to understand: Once the market sees that Kraft is 'stopping' December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage, thereby reducing the commercial wheat basis to Kraft." *Id*. at ¶ 30. Kraft senior management approved the proposal, so long as the position was reduced to $50 million by the end of December. However, Kraft did not have a bona fide commercial need for $50 million of wheat in December 2011, let alone $90 million. *Id*. at ¶ 32. $90 million of wheat would have amounted to approximately 15 million bushels, a six month supply for the Mill that Kraft could not store. *Id*. at ¶ 32. $50 million of wheat would have amounted to a more than three month supply, which Kraft had no commercial need for or ability to store. *Id*. at ¶ 33. According to Plaintiff, Kraft never intended to take delivery of 15 million bushels of wheat, but instead wanted the market to believe it would, so that the price for cash wheat would lower and the price for wheat futures would go up.

As alleged, Kraft procurement employees thereafter executed the strategy as planned. *Id*. at 35. They accumulated 3,150 long CBOT December 2011 wheat futures contracts by November 29, 2011, the first day of the delivery period. *Id*. That was equivalent to 15.75 million bushels or $93.5 million of wheat. As of December 7, 2011, that position constituted 87% of the open interest. *Id*. In a December 2, 2011 email, the Kraft Senior Director of Global Procurement confirmed the strategy was working as planned, noting that – as they had expected – the price

of cash wheat was declining and the December/March futures spread was narrowing. *Id*. In that email, the Senior Director confirmed that "if all goes according to plan" Kraft would save $7MM on the commercial cost of wheat and make $2-3MM on reversing out of the December/March wheat spread. *Id*. at ¶ 36. Ultimately, Kraft took delivery of just 660,000 bushels of wheat from its futures position, less than 5% of the wheat position it carried in early December and equivalent to approximately $4 million worth of wheat. *Id*. at ¶ 38. On December 9, 2011, Kraft offset all of its remaining long futures contracts in the market (80% of the open interest), but did not buy a similar quantity of wheat in the cash market, which it would have needed to do if it really required all of the wheat it had previously purchased via futures contracts. *Id*. at ¶ 39. Kraft's action caused cash wheat prices to decline and futures prices to go up. *Id*. at ¶ 40. In particular, December 2011 wheat futures prices increased from $5.75 as of November 28, 2011 to $6.12 as of December 2, 2011. *Id*. Cash wheat prices in Toledo declined from $6.16 per bushel as of December 2, 2011 to $5.86 per bushel as of December 9, 2011. *Id*. As a result of these price shifts, Kraft pocketed over $5.4 million dollars. *Id*.

In light of such assertions in the Complaint, this Court finds that Plaintiff has adequately pled manipulation here by alleging that: (1) Kraft took a huge wheat futures position; (2) that it did not intend to use in production; (3) but instead intended that the position would signal Kraft's demand for wheat in the relevant time period; (4) in a way that would mislead others in the market into thinking that Kraft would take delivery of its futures position and not buy cash wheat; (5) which

was intended to, and in fact did, cause cash wheat prices to decrease and the price for futures to increase.

Despite these clear allegations regarding a scheme that generated millions of dollars for Kraft, Defendants argue that the Complaint is still deficient in that it does not offer any facts showing "how" Kraft allegedly misled the market as to its intended use of wheat futures. [57] at 15. In other words, Defendants argue that the CFTC must allege "something suggesting that the market allegedly received a message from Kraft, in some particularly identified form, that was different from Kraft's alleged true intent," and that the "mere fact that Kraft established a large long position in December 2011 wheat futures cannot, in and of itself, be the method by which Kraft allegedly misled the market." *Id.*

The law, however, imposes no such pleading requirement. Instead, the Complaint specifically alleges that Kraft acquired a massive futures position in December 2011 wheat futures "in order to induce sellers to believe that Kraft would take delivery, load out, and use that wheat in its Mill." *Id.* at ¶ 25. Quite simply, Kraft sought to create the false appearance of demand for wheat from the December 2011 futures contract. Kraft had no intention to use the wheat from its huge futures position. Thus, Kraft, through its activities in the market, conveyed a false sense of demand, and the resulting prices in the market (both of cash wheat and of wheat futures) were based not solely on the actual supply and demand in the market, but rather were influenced by Kraft's false signals of demand.

In response, Kraft argues that its massive long position could have signaled many things, and that its market position strategy, therefore, cannot qualify as adequately deceptive or manipulative. While this might prove true upon further discovery, the Court is confined at this stage to the Complaint itself. Because the Complaint adequately alleges that Kraft fraudulently took its futures position to signal intent to take delivery of the December 2011 wheat from its futures contracts, and that the market was misled by that signal, which ultimately resulted in the prices at issue being based not upon market forces, but rather upon false signals, the Court finds that Plaintiff has adequately pled manipulative conduct.

### iii. Scienter

Under Regulation 180.1, the level of scienter required to plead a cause of action for manipulation is "intentionally or recklessly." 17 C.F.R. § 180.1(a). In its notice of final rule making regarding Regulation 180.1, the CFTC stated that "a showing of recklessness is, at a minimum, necessary to prove the scienter element of final Rule 180.1. Consistent with long-standing precedent under the commodities and securities laws, the Commission defines recklessness as an act or omission that 'departs so far from the standards of ordinary care that it is very difficult to believe the actor was not aware of what he or she was doing.'" *Final Rule,* 76 Fed. Reg. at 41,404.

Defendants argue, however, that this Court should disregard the plain language of this text, and instead require a showing of "intentional" conduct, or at the very least "extreme recklessness." [57] at 19. In support, Defendants cite cases

interpreting the scienter requirement in Section 10(b) and Rule 10b-5 cases. [57] at 18-19. The relevant text and case law, however, fails to support the Defendants' suggested reading.

First, the language in Section 10(b) and Rule 10b-5 materially differs from Section 6(c)(1) and Regulation 180.1 with regard to scienter. The SEC provisions contain no express scienter requirement, while Section 6(c)(1), via Regulation 180.1, specifically requires intentional or reckless conduct. *Compare* 15 U.S.C. § 78j *and* 17 C.F.R. § 240.10b-5 *with* 7 U.S.C. § 9(c)(1) *and* 17 C.F.R. § 180.1.

Likewise, contrary to Defendants' argument, case law interpreting Section 10(b) has actually adopted a recklessness standard. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (Rule 10b-5 scienter requires proof that the defendant either "knew the statement was false or was reckless in disregarding a substantial risk that it was false"); *Van Dyke v. Coburn Enters., Inc.*, 873 F.2d 1094, 1100 (8th Cir. 1989) (collecting cases and adopting majority rule holding that recklessness is sufficient to establish a Rule 10b-5 violation).

Given the foregoing, the Court adopts the scienter requirement supported by long-standing precedent under the commodities and securities laws, and confirmed by the CFTC in its notice of final rule-making. *See* 76 Fed. Reg. 41,404; *Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988); *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied*, 434 U.S. 875 (1977); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093–94 (9th Cir. 2010); 17 C.F.R. § 180.1. Therefore, Plaintiff must plead facts showing that

Kraft's conduct was either reckless or intentional; and this standard can be met by allegations of conduct showing "an extreme departure from the standards of ordinary care" which "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand*, 553 F.2d at 1044 (7th Cir. 1977).

In this case, Plaintiff has adequately pled scienter because the Complaint sets out factual allegations showing that Kraft intended to "deceive or defraud investors by controlling or artificially affecting the price of" commodities and/or futures. *Hochfelder*, 425 U.S. at 199. Plaintiff specifically alleged that Kraft adopted its strategy of buying wheat futures "***in order to*** depress the price of wheat in the cash market and inflate the futures price of wheat." [1] at ¶ 29 (emphasis added). It supported that allegation by pleading specific facts showing intent. Those facts can be broken down into two categories: (1) the emails showing direct evidence of intent; and (2) the allegations of circumstantial evidence showing intent.

With regard to the emails, drawing all inferences in Plaintiff's favor, the allegations support a finding of intentional conduct. In an October 20, 2011 email, the Kraft Senior Director of Global Procurement began to describe his plan by putting the phrase "take physical delivery in December" in quotations, suggesting to the Court that there was no intent to take delivery. *Id*. at ¶ 30. The Senior Director then described how the market would react to their plan, explaining that once "the market sees that Kraft is 'stopping' December wheat, we anticipate the futures curve will begin to flatten, reducing the profitability of wheat storage,

thereby reducing the commercial wheat basis to Kraft." *Id.* at ¶ 30. The wheat "basis" is the difference between the cash price and the futures price (cash price minus futures price). *In re Grain Land Coop*, 978 F. Supp. 1267, 1269 (D. Minn. 1997), *aff'd sub nom. Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983 (8th Cir. 1999). A reduction in the wheat basis would mean that commercial wheat prices were declining while futures prices were rising.

Later, on December 2, 2011, that same Senior Director wrote an email confirming that the strategy was working as planned. *Id.* at ¶ 36. He explained that:

> ***As expected***, the Dec/Mar spread has narrowed to app[roximately] 11 cents resulting in a market to market gain of $3.6MM on our open spread position. Meanwhile, with the narrowing spread, the cash wheat basis has declined from +80 cents to +50 cents over Dec futures. As we begin purchasing this cheaper basis commercial wheat, we will unwind the existing spread position. ***If all goes according to plan***, we will still save $7MM on the commercial cost of wheat vs where it was a few weeks ago as well as make $2-3MM on reversing out of the Dec/Mar wheat spread. *Id.* (emphasis added).

Drawing all reasonable inferences in Plaintiff's favor, this shows that Kraft "expected" its actions to affect the market by lowering the cost for cash wheat and raising the cost for wheat futures. It also shows that Kraft had a "plan" in place that it expected would allow it to save money on cash wheat and make money on wheat futures. Drawing inferences in Plaintiff's favor, such emails demonstrate that Kraft intended that its futures position would manipulate both the market for cash wheat and the market for wheat futures.

Likewise, the circumstantial allegations surrounding Kraft's purchase of December 2011 wheat futures show Kraft's intent to improperly manipulate the

market for its own financial gain. The strategy adopted by Kraft from the very beginning required that it sell back at least $40 million of the wheat futures within weeks after it obtained the futures position; implicitly showing that it never had a bona fide need for nearly half of its position and indicating that the actual purpose for buying $40 million of futures was to improperly affect wheat prices. [1] at ¶ 31-21. Further, there are numerous other allegations suggesting that Kraft had no commercial need for the $90 million in wheat, or any economic reason for buying that wheat through the futures market. Kraft strives to maintain a two-month supply of wheat, not a six-month supply. *Id.* at ¶ 14. During the relevant time period, Kraft had available storage space for less than one million bushels of wheat. *Id.* at ¶¶ 14, 33. $90 million of futures wheat would have totaled 15 million bushels. That meant that Kraft would have had to pay storage of five cents per bushel per month for up to six months for all wheat in excess of its storage space. *Id.* at ¶ 33. It also would have had to pay additional shipping costs to have the CBOT wheat delivered to the Mill. Kraft knew, from its September 2011 trial run, that much, if not all, of the CBOT wheat would be tendered for delivery in locations that would make transport to the Mill prohibitively expensive, illustrated by the fact that it cost Kraft $1.21 per bushel to ship the December 2011 CBOT wheat that it did load out. *Id.* at 37. If Kraft had indeed taken delivery of all 15 million bushels of wheat, it also would have had to purchase additional, higher-quality, cash wheat to blend with CBOT wheat in order to produce flour with a low enough vomitoxin levels to be

fit for human consumption, adding further costs to any effort to take delivery of CBOT wheat.

Finally, the facts alleged in the Complaint further show that even though Kraft claims to have had a commercial need for $90 million of wheat, it never purchased a similar quantity of replacement wheat once it decided not to take delivery on the whole of its $90 million wheat futures position. Much of Kraft's motion is conceptually anchored on Kraft's argument that it is being wrongfully punished for seeking to secure a supply of wheat in a difficult market. According to Kraft, it was simply "a snack-food company that made reasonable business decisions to maintain a steady wheat supply in the face of an uncertain market," and the CFTC is wrongly accusing Kraft of manipulation "for seeking to purchase wheat at the best price it could in the face of difficult market conditions." [57] at 1. In other words, Kraft claims that it was just reducing risk by buying the "wheat it needed for its flour mills" on the futures market in order to protect against price fluctuations. [57] at 1. While discovery may ultimately prove this version of events to be true, the Complaint as pled shows just the opposite.

According to the Complaint, Kraft bought $93.5 million in wheat futures (15.75 million bushels), but loaded out less than 5% of that position (roughly 660,000 bushels). [1] at ¶ 35, 38. In spite of Kraft's professed commercial "need" for that amount of wheat, it later failed to purchase a similar amount of wheat in the cash market (or elsewhere) once it decided not to take delivery of its futures wheat. If Kraft possessed a real commercial need for $90 million dollars of wheat, then

Kraft would ostensibly need to buy that wheat from somewhere after deciding not to get it from the futures market.

In short, Plaintiff's allegations are sufficient to allege that Kraft intended to manipulate the wheat markets. At the very least, they show that Kraft engaged in reckless conduct against the markets. This is sufficient to plead scienter under Section 6(c)(1) and Regulation 180.1. Defendant's motion to dismiss Count I is denied.

### C. Count II: Violation of Sections 9(a)(2), 6(c)(3) and Regulation 180.2

Under Sections 9(a)(2), 6(c)(3) and Regulation 180.2, manipulation has been described as: (1) the "intentional exaction of a price determined by forces other than supply and demand," *Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir. 1991), or (2) the "creation of an artificial price by planned action, whether by one man or a group of men." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995) (citing *General Foods Corp. v. Brannan*, 170 F.2d 220, 231 (7th Cir. 1948). Manipulation in practice, however, often "defies easy description" and thus manipulation cases "tend to be characterized by fact specific, case-by-case analysis." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995); *Frey*, 931 F.2d at 1175. (the "'know it when you see it' test may appear most useful"). Indeed, "Congress' decision to prohibit manipulation without defining it apparently arose from the concern that clever manipulators would be able to evade any legislated list of proscribed actions or elements of such a claim." *In re Soybean Futures Litig.*, 892 F. Supp. at 1044. Because the "methods and

techniques of manipulation are limited only by the ingenuity of man," the test for manipulation must be a practical one aiming to "discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand." *Premium Plus Partners, L.P. v. Davis*, 653 F. Supp. 2d 855, 876 (N.D. Ill. 2009) (citing *Cargill v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971)), *aff'd sub nom. Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533 (7th Cir. 2011).[6]

With the above guidance in mind, courts have articulated a four part test for price manipulation under Sections 9(a)(2), 6(c)(3) and Regulation 180.2.[7] Plaintiff must allege that: (1) the defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendants caused the artificial price; and (4) the defendants specifically intended to cause the artificial price. *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 801 F.3d 758, 764-65 (7th Cir. 2015). The Court will address each element in turn.

### i. Ability to Influence Prices

Defendants argue that Plaintiff has not adequately alleged that Kraft had the ability to influence prices. [57] at 22. According to Defendants, there are three situations in which the ability to influence prices may exist: (1) when the defendant controls both the long futures market and the cash market, which is known as a

---

[6] While the District Court in *Premium Plus Partner, L.P. v. Davis* declined to adopt the *Cargill* holding in its entirety, it cited with approval the relevant language quoted by the Court here, and adopted *Cargill*'s reasoning that there was not a "rigid definition of manipulation that would be applicable to every CEA manipulation claim." *Premium Plus*, 653 F. Supp. 2d at 876.

[7] The parties agree that the test is the same under Section 9(a)(2), 6(c)(3) and Regulation 180.2. *See* [57] at 22; [64] at 22.

"corner"; (2) when the defendant controls the long futures market during a known shortage of cash commodities, which is known as a "squeeze"; and (3) when the defendant misleads regulators or otherwise injects false information into the market. *Id.* at 22-24. Defendants claim that, because the manipulation alleged by the Plaintiff does not fit within those three categories, Plaintiff has not adequately pled the ability to influence prices. *Id.*

The case law cited by the Defendants, however, does not stand for the proposition that the three categories of "ability" outlined by Defendants constitute a limitation defining the exclusive methods of showing an ability to influence price. Quite to the contrary, courts have made clear that these are words of illustration, not limitation, stating that the "methods and techniques of manipulation are limited only by the ingenuity of man" and the court's aim must be to "discover whether conduct" has resulted in a price "which does not reflect basic forces of supply and demand." *Premium Plus Partners*, 653 F. Supp. 2d at 876. In light of such case law, attempts by the Defendants to pigeonhole the Plaintiff's allegations are unavailing.

For instance, the Complaint here is not alleging a "corner" or a "squeeze." A party is said to "corner" a market when "it has a net long position and owns all or substantially all of the deliverable supply of a particular commodity." *In re Soybean Futures Litig.*, 892 F. Supp. at 1034. In other words, the party doing the cornering owns a high percentage of the "long" contracts for the underlying commodity, which entitles it to the delivery of that commodity on a certain date by the person on the

other side of the contract – the "short."  If, at the same time, the long owns a high percentage of the cash or deliverable supply of the commodity, the long could force the short to pay an artificially high price to settle its accounts.  *Id*. at 1034.  On the other hand, a "squeeze" is when "a trader attains a dominant long position and can force shorts facing an inadequate cash supply to cover their positions at inflated prices.  The shorts are 'squeezed' into settling their holdings with the dominant long at above-market prices as the delivery date approaches."  *Frey*, 931 F.2d at 1175.

Here, the Complaint alleges neither a corner nor a squeeze.  It does not claim that Kraft sought to acquire a dominant long position such that it could force the shorts into an unfavorable negotiating position when attempting to settle their contracts.  As such, it is inappropriate to analyze the Complaint under cases discussing the requirements for corners and squeezes.  What the Complaint alleges is that Kraft bought a massive "long" futures position without any real intent to take delivery of that futures wheat.  [1] at ¶ 34.  Instead, Kraft intended that the market would believe it would take delivery of the wheat for use in its mill and react to that belief by lowering the price for cash wheat in the Toledo area.  *Id.*  In other words, the market would believe that, because Kraft – one of the largest end users of commercial wheat – had satisfied its demand for wheat through the futures market, there was significantly less demand for wheat in the cash market.  This belief would then cause the price for cash wheat to fall.  Similarly, the Complaint alleged that by buying such a large position in the futures market (87% of the open interest), Kraft intended to drive the market prices of futures contracts higher by

falsely indicating a high demand for those contracts. *Id.* at ¶ 29. According to the Complaint, Kraft succeeded in accomplishing both goals, and improperly made over $5.4 million in profits as a result. *Id.* at ¶ 40.

The question for this Court, then, is whether – based on a "fact specific, case-by-case analysis" – the Complaint alleges that Kraft had the ability to influence prices. Drawing all reasonable inferences in Plaintiff's favor, the Court finds that it does. Apart from the three non-exhaustive categories listed by the Defendant, federal courts have found that: (1) the possession of a dominant market position, even without facts suggesting a squeeze or a corner, is sufficient to show ability to influence prices, *see In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 MD 2213 RPP, 2012 WL 6700236, at \*10 (S.D.N.Y. Dec. 21, 2012); *CFTC v. Enron Corp.*, No. H-03-909, 2004 WL 594752, at \*5 (S.D. Tex. Mar. 10, 2004); (2) allegations of actual price changes resulting from defendant's actions support a finding of ability to influence prices, *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012); (3) possession of futures contracts in excess of the CBOT's limits support a finding of ability to influence prices, *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 483 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir. 2009); and (4) buying and holding large positions, along with the lack of a legitimate economic motive, is sufficient to show manipulation. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008).

For instance, in *United States Commodity Futures Trading Commission v. Enron*, No. H-03-909, 2004 WL 594752, at \*1 (S.D. Tex. Mar. 10, 2004), the trial

court considered the manipulative character of massive natural gas trades made by the defendants. There, the Complaint alleged that the gas trader defendants had engaged in a scheme to manipulate the price of natural gas in the Henry Hub next-day gas spot market and the Henry Hub August 2011 gas futures market by purchasing an extraordinarily large amount of Henry Hub Spot Market gas within a short time period. *Id*. at *1-2. This resulted in prices becoming artificial in both the spot and futures markets. *Id*. The defendant traders moved to dismiss the complaint, but the court denied that motion. *Id*. In doing so, it discussed both market corners and squeezes, but ultimately concluded that manipulation "does not always require market control" of that kind. *Id*. at * 5. The court instead found that "buying or selling in a manner calculated to produce the maximum effect upon prices, frequently in a concentrated fashion and in relatively large lots is one form of manipulation, among others." *Id*. (internal citations and quotations omitted). The court thus held that the complaint sufficiently alleged that the trader defendants "had the 'ability' to force an increase in the price of gas such that an increase did occur through the buying of an 'extraordinary' position in gas." *Id*. at *6; *see also In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.,* No. 11 MD 2213 RPP, 2012 WL 6700236, at *10 (S.D.N.Y. Dec. 21, 2012) (allegations that defendant held large silver short positions was sufficient to allege ability to influence prices).

The facts alleged here show a similar scenario. Essentially, the Complaint alleges that Kraft intended to create false impressions of demand in the markets for

both futures wheat and cash wheat. Kraft allegedly had the ability to do so because it is one of North America's largest consumer packaged food companies, [1] at ¶ 8, and one of the largest domestic end users of wheat. *Id.* at ¶ 11. Kraft therefore could afford to purchase a $90 million futures position that constituted 87% of the open interest and conveyed certain false impressions regarding the demand for wheat. According to the Complaint, those actions resulted in price changes of 37 cents in the wheat futures market, and 30 cents in the cash wheat market. They also resulted in Kraft holding a futures position (3,150 contracts) that significantly exceed the CBOT speculative position limit (600 contracts). More specifically, on December 2, 5, 6, 7 and 8, Kraft held a long position that exceeded the limits by 2,110, 2106, 1,666, 1,226 and 226 contracts, respectively. *Id.* at 49. In light of these allegations, the Court finds that Plaintiff has adequately pled the ability to influence prices.

### ii. Intent to Cause an Artificial Price

Defendants argue that the Complaint fails because it does not allege that Kraft intended to cause an artificial price. [57] at 24. To state a cause of action for price manipulation under Section 6(c)(3), 9(a)(2) and Regulation 180.2, the Plaintiff must alleged that the "defendant specifically intended to cause the artificial price." *In re Soybean Futures Litig.*, 892 F. Supp. at 1030. To establish intent, "it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *CFTC v. Amaranth Advisors, L.L.C.*, 554

F. Supp. 2d 523, 532 (S.D.N.Y. 2008) (internal citations and quotations omitted). However, mere knowledge that "certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA." *In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012).

Intent is what separates "lawful business conduct from unlawful manipulative activity." *Indiana Farm Bureau Cooperative Ass'n, Inc.*, No. 75-14, 1982 WL 30249, at *6 (CFTC Dec. 17, 1982). This means that the intent to artificially affect prices can convert otherwise legal, open-market transactions into manipulative activity. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008). As the court in *In re Amaranth* explained: "Because every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate. Thus, a legitimate transaction combined with an improper motive is commodities manipulation." *Id.*

Because proof of intent is often based on circumstantial evidence, "manipulative intent must normally be shown inferentially from the conduct of the accused." *CFTC v. Enron Corp.*, No. 03 909, 2004 WL 594752, at *7 (S.D. Tex. Mar. 10, 2004) (citing *Indiana Farm Bureau*, 1982 WL 30249, at *7); *Amaranth Advisors*, 554 F. Supp. 2d at 532. Here, there are allegations of both direct and circumstantial evidence of intent. For reasons explained in more detail above, *see supra* Part III(B)(iii), the Court finds that the Plaintiff has adequately alleged more

than the mere knowledge that Kraft's actions would affect the markets. They have alleged that Kraft had the intent to manipulate the markets.

Defendants' argument to the contrary is not convincing. Defendants argue that the Complaint alleges, at most, that Kraft's trading was meant to induce a particular group of local grain elevators in Toledo to reduce the surcharge they were applying to the futures price. [57] at 27. According to Defendants, these actions constitute local price competition, not market manipulation. Defendants claim that alleging local price competition is insufficient because the CEA requires that actionable manipulation be directed at the price of a futures contract or the price of the commodity underlying the futures contract. It does not reach local price competition. Defendants' assertion is incorrect.

First, the specific allegations cited by Defendants, paragraphs 30, 36 and 40 of the Complaint, do not refer solely to Toledo grain surcharges. Paragraph 36 of the complaint quotes the December 2, 2011 Kraft email which says: "the cash wheat basis has declined from +80 cents to +50 cents over Dec futures." [1] at ¶ 36. The "basis" is the "difference between the price of the cash commodity and the price of a designated futures contract for that commodity." *In re Grain Land Coop*, 978 F. Supp. at 1269. There is nothing in the Complaint to suggest that the basis in this matter dropped due to, or solely due to, a reduction in surcharge prices by Toledo area grain elevators. In fact, there is nothing in the Complaint to even suggest that surcharge prices were reduced. While a reduction in surcharge prices could influence the cash wheat basis, Plaintiff here alleges that the basis dropped because

the price of cash wheat fell in reaction to Kraft's market position. [1] at ¶ 34. As required, the Court confines its analysis to the allegations contained in the Complaint. *See Williamson*, 714 F.3d 432 at 436. In the other paragraph that Defendants rely on for their argument that Plaintiff only alleged an effect on local grain surcharges, paragraph 40, the Complaint specifically alleges that, because of Kraft's actions, the wheat futures prices increased and the cash wheat prices decreased. [1] at ¶ 40. The paragraphs cited by Defendants thus do not pose a meaningful challenge to Plaintiff's claims here.

Second, the entirety of the Complaint clearly alleges a fraudulent scheme in which Kraft intended to manipulate the prices of both cash wheat and December 2011 wheat futures. Examining the totality of Plaintiff's allegations, this Court cannot find that Kraft's trading was only intended to manipulate Toledo area grain surcharges. *See, e.g.,* [1] at ¶¶ 12-14, 24-27, 29-40.

### iii. Existence of an Artificial Price

Defendants argue that Plaintiff failed to allege facts from which the Court may infer that Kraft created an "artificial price." A price is "artificial" for purposes of Section 9(a)(2), Section 6(c)(3) and Regulation 180.2 when it "does not reflect the market or economic forces of supply and demand." *Indiana Farm Bureau*, 1982 WL 30249, at *4 n.2. In determining whether an artificial price has occurred the Court must:

> look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market. When the aggregate forces of supply and demand bearing down on a

particular market are all legitimate, it follows that the price will not be artificial. On the other hand when a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial. Thus, the focus should not be as much on the ultimate price as on the nature of the factors causing it. *Id.*

A "price may be artificial if it is higher than it would have been absent Defendants' conduct." *Parnon Energy Inc.*, 875 F. Supp. 2d 233, 247 (S.D.N.Y. 2012). As such, determining "artificiality involves an analysis of the suspected price in context of the aggregate supply and demand factors." *Id.* However, misconduct alone is not "sufficient proof of price artificiality." *In re Soybean Futures Litig.*, 892 F. Supp. at 1057.

At this early stage in the proceedings, Plaintiff is only required to plead "factual content that allows the court to draw the reasonable inference" that the price was artificial. *Yeftich*, 722 F.3d at 915. Under that standard, the Court finds that Plaintiff has adequately alleged an artificial price. Plaintiff alleges that the prices of cash wheat and wheat futures were not the product of true supply and demand, but of the false impressions of demand created by Kraft's actions. As alleged, the prices at issue were not caused solely by legitimate market forces, but the result of Kraft's $90 million position affecting the legitimate forces in the market. Further, the Complaint supplies specific information concerning the effect that Kraft's illegitimate actions had on the market – lowering cash wheat prices from $6.16 to $5.86, and raising futures wheat prices from $5.75 to $6.12. [1] at ¶ 40. The Court finds that this is sufficient to plead an artificial price.

Defendants argue that the artificial prices alleged by Plaintiff are not in fact "artificial" because the relevant markets converged as the date for delivery drew

near. According to Defendants, in a well-functioning market the prices for cash commodities and futures will converge towards the same price as the date for delivery draws near. [57] at 28-20. Because the prices here converged, claim Defendants, the prices could not have been artificial. As a preliminary matter, this argument is unavailing because: (1) there is nothing in the Complaint suggesting that Defendants' theory regarding convergence in the wheat market applies in this case; and (2) Defendants' own motion undercuts their position by suggesting that the wheat market is "dysfunctional," not well-functioning, and that the "failure of the price of wheat futures to converge with the price of cash wheat is a well-known phenomenon." [57] at 1; 5 n. 8..

Even ignoring these shortcomings and taking Defendants' argument on its merits, it fails at this early stage. Simply because prices converge normally at certain points does not mean that Plaintiff failed to properly allege artificial prices in this case. As alleged here, on December 2, 2011, the price for cash wheat was $6.16 and the price for futures wheat was $6.12. [1] at ¶ 40. Plaintiff asserts that Kraft's actions caused futures prices to be artificially high, such that they would have been lower than $6.12 in the absence of Kraft's actions. Plaintiff also alleges that Kraft's long position resulted in cash prices that were artificially low, such that they would have been higher than $6.16. This suggests that, in the absence of Kraft's actions, there should have been a lesser degree of convergence than actually occurred. Because Kraft's actions were not taken due to a legitimate demand, the prices created by those actions were artificial, and thus the degree of convergence

was artificial. This is true regardless of whether a given market theory suggests that the prices should converge. In sum, the Complaint makes clear that the market prices reacted differently than they would have under the legitimate forces of supply and demand, which is sufficient to allege an artificial price. *Indiana Farm Bureau*, 1982 WL 30249, at *4 n.2.

Finally, though Defendants argue that the lack of historical pricing data is fatal to Plaintiff's allegation of price artificiality, they cite no case law showing that such data is an absolute necessity for a claim for manipulation. Given this Court's duty to undertake a case-by-case practical analysis, it finds that the facts alleged here are sufficient to plead price artificiality in the absence of historical price data.

### iv. Causation

Defendants originally declined to submit a detailed argument regarding causation, confining their contentions to a footnote claiming that by "failing to state a claim that an 'artificial price' existed, the CFTC necessarily also fails to state a claim that Kraft 'caused' an 'artificial price' as §9(a)(2) requires." [57] at 29 n. 16. Because the Court finds that Plaintiff has successfully alleged an "artificial price," this argument carries no weight.

Defendants also attempt to submit an entirely new argument regarding causation in their reply brief. There, they argue that "Kraft's trading in the deliverable futures market did not directly result in changes to cash market prices." [57] at 15. Because this argument was raised for the first time in Defendants' reply brief, it is waived. *See Darif v. Holder*, 739 F.3d 329, 337 (7th Cir. 2014); *Arrieta v.*

*Wexford Health Sources, Inc.*, No. 13 C 6765, 2015 WL 1326395, at *2 (N.D. Ill. Mar. 20, 2015).

Even if the Court were to consider this argument on its merits, it would find Defendants' contentions unpersuasive. As alleged, Kraft's purchase of the $90 million futures position directly caused the artificial prices here. Plaintiff pleads circumstantial evidence of causation, emails supporting that causation, and specific prices that were created by Kraft's actions. These artificial prices were not just in the cash market, which is the market in which Defendants focus their reply brief argument, but also in the futures market. Plaintiff has adequately pled causation.

### v. Attempted Manipulation

With regard to attempted manipulation, Defendants' sole argument is that Plaintiff did not adequately allege intent. As the Court has previously found that Plaintiff sufficiently pled intent, Defendants' claim here must fail. Defendants' motion to dismiss Count II is denied.

## IV. Conclusion

Defendants' motion to dismiss Counts I and II [56] is denied.

IT IS SO ORDERED

Dated: December 18, 2015

United States District Judge