## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| U.S. Commodity Futures<br>Trading Commission,<br><br>   Plaintiff,<br><br>  v.<br><br>Kraft Foods Group, Inc., and<br>Mondelēz Global LLC,<br><br>   Defendants. | Case No. 15 C 2881<br><br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

This matter concerns the alleged misconduct of Defendant Kraft in purchasing and selling wheat and wheat futures. On December 18, 2015, the Court denied Defendants' motion to dismiss Counts I and II. [87]. Currently before the Court are two motions: (1) Defendants' motion to certify issues for interlocutory appeal and to stay proceedings [90]; and (2) Plaintiff's motion to strike affirmative defenses. [94], [95]. As explained in more detail below, Defendants' motion is denied, and Plaintiff's motion is granted.

## I. Defendants' Motion to Certify Issues for Interlocutory Appeal

Defendants ask that the Court certify two questions for appeal based upon the Court's Memorandum Opinion and Order denying Defendants' motion to dismiss. Those two questions are: (1) "whether a defendant's large futures position, coupled with an alleged intent to affect market prices but absent any other false communications to the market, constitutes 'false signaling' market manipulation under §§ 6(c)(1) or 9(a)(2) of the Commodity Exchange Act ("Act") and corresponding

Regulations 180.1 and 180.2"; and (2) "whether, when a defendant's purchases in the futures market cause cash and futures market prices to converge, those converging prices are 'artificial' for purposes of those same statutory provisions and regulations." [91] at 1.

To certify an order for interlocutory appeal under 28 U.S.C. § 1292(b), there must be: (1) a question of law; and that question must be (2) controlling and (3) contestable, and (4) promise to speed up the litigation. *Ahrenholz v. Board of Trustees of University of Illinois*, 219 F.3d 674, 675 (7th Cir. 2000). "Unless all these criteria are satisfied, the district court may not and should not certify its order to [the Seventh Circuit] for an immediate appeal under section 1992(b)." *Id.* at 676. There also is a non-statutory requirement that the petition in this Court be filed within a reasonable time after entry of the order sought to be appealed. *Id.* at 675. Interlocutory appeals are generally "frowned on in the federal judicial system," *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012), and this case is no exception. Both questions proposed by Defendants here fall short of the Section 1292(b) requirements.

Before addressing each individual requirement, the Court first will examine Defendants' principle authority – *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 865 (7th Cir. 1995). In *Sullivan & Long*, the plaintiffs brought the following claims: (1) wrongful price manipulation under Section 9(a)(2) of the Securities Exchange Act of 1934; and (2) market manipulation under Section 10(b) of the same act and its implementing regulation, Rule 10b-5. Their claims were based upon an

alleged scheme by the defendant to manipulate the market through the "unprecedented massive short selling" of common stock of LTV Corporation ("LTV"). The Seventh Circuit described the factual background as follows: "LTV, a large steel producer, entered bankruptcy in 1986. In February of 1993, it announced a proposed plan of reorganization under which existing stock in the company would be replaced by new stock most of which would be issued to the bondholders and other creditors of LTV. Existing stockholders would receive warrants entitling them to purchase some of the new stock. The plan contained an estimate that the new shares would be worth only 3 or 4 cents. When the plan was announced, the old shares were trading for more than 30 cents. There were 122 million old shares outstanding. The plan was confirmed by the bankruptcy court on May 27, 1993, and the court fixed June 29 as the last day on which the old shares would be tradable." *Id*. at 859.

Beginning before the date of confirmation, but greatly accelerating on that date, the defendant sold short huge quantities of the old LTV shares. *Id*. It sold short 170 million shares, far more than the 122 million old LTV shares then outstanding. *Id*. A "short" sale is a sale at a priced fixed now for delivery later. A trader "sells a stock short when he thinks the price of the stock is going to fall, so that when the time for delivery arrives he can buy it at a lower price and pocket the difference. If, for example, he sells the stock short at 50 cents a share, and the price falls to 40 cents before he delivers the stock, he can buy the stock for 40 cents a share, deliver it to the buyer, and have made a profit of 10 cents." *Id*. The plaintiffs

3

in *Sullivan & Long* were buyers on the other side of the short sales, who presumably thought the price of the old shares would rise before plunging to 3 or 4 cents on June 29. *Id*. According to the court, "on May 27 it was certain, or virtually so (nothing is *really* certain), that shares of common stock in LTV would be worth no more than 4 cents in just a month." *Id*. (emphasis in original). However, many of the plaintiffs did not realize that certainty, because they did not thoroughly read the plan of reorganization. *Id*. at 860.

Following its description of the relevant facts, the court went into an extended economic analysis. Its focus was plaintiffs' failure: (1) "to identify any harm to the objectives of the securities laws under which they [had] sued"; and (2) to identify a specific rule the defendant violated. As to the first concern, the court cited to an article from the Journal of Finance and explained that the central objective of the securities laws is "to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded. An efficient stock market is one in which stock prices reflect all potentially available information that is relevant to the economic value of the stocks." *Id*. at 861. The court went on, "we would think twice before concluding that these laws prohibit 'schemes' that accelerate rather than retard the convergence between the price of a stock and its underlying economic value and therefore promote rather than impair the ultimate goals of public regulation of the securities markets. *Objectively*, from May 27 on old shares of LTV stock were worth

only 3 or 4 cents, and the defendant's campaign of short selling helped move the market price toward that *true* value." *Id*. at 861-62 (emphasis added).

Without focusing on a specific cause of action, the court next addressed plaintiffs' claim that defendant's short selling had created an "artificial price" in the market for LTV stock. The plaintiffs had alleged that the defendant's short sales were manipulative in that they created artificial prices. Citing to the Supreme Court case *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976), the Seventh Circuit explained that artificial prices are those "that do not reflect underlying conditions of supply and demand." *Id*. at 862. However, the court then analyzed the allegedly artificial prices without any overt discussion of supply and demand, but instead based on the objectives of securities regulation. It found that the "only artificial prices . . . were the prices at which LTV stock sold between the confirmation of the plan and the expiration of the old stock. They were artificially high because they so greatly exceeded the stock's *true value*, which was only 3 to 4 cents." *Id*. at 862 (emphasis added). What the defendant did was not manipulation, said the court, but arbitrage, eliminating disparities between price and value (or – in *Sullivan & Long* – between today's price and tomorrow's price where the difference cannot be attributed to any prospective change in value). *Id*. Defendant had thus promoted "the convergence of market and economic values that [the court had] suggested was the central objective of securities regulation." *Id*. at 862.

Based upon the foregoing economic analysis, the court concluded that "nothing alleged in the complaint is the kind of conduct that the securities laws are

aimed at combatting. It is therefore not surprising that none of the plaintiffs' specific legal contentions has merit." *Id*. at 864. It is at this point in the opinion that the court began its legal analysis of the plaintiffs' specific claims.

Regarding the Section 9(a)(2) claim, the Court noted that Section 9(a)(2) forbids "transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). The court explained that the "essence of the offense is creating 'a false impression of supply or demand,' for example through wash sales, where parties fictitiously trade the same shares back and forth at higher and higher prices to fool the market into thinking that there is a lot of buying interest in the stock." *Id*. at 864 (citing *Sante Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1997)). The court found that there was no such misconduct in *Sullivan & Long* because there were real buyers on the other side of all of defendant's short sale transactions – and thus there were no "wash sales." *Id*. It also noted that defendant made no representations, true or false, actual or implicit, about how many shares it would sell short. *Id*. Thus, there had been no "deception" by the defendant. *Id*. In sum the court based its Section 9(a)(2) conclusion upon two specific bases:

> (1) That defendant had not created "a false impression of supply or demand," for example through wash sales, because there were real buyers on the other side of all of defendant's short sales; and

> (2) That defendant had made no representations, true or false, and therefore there had been no deception.

The court next addressed plaintiff's claim under Rule 10b-5. Rule 10b-5 requires "proof of *either* deception **or** manipulation." *Id.* at 865 (emphasis added). The court found that there had been no deception, ostensibly based upon the lack of representations by defendant. *Id.* As to manipulation, the court explained that most forms of manipulation "involve deception in one form or another." *Id.* at 865 (citing *Santa Fe*, 430 U.S. at 476-77). As to the defendant's supposedly manipulative practices that were not based upon deception, the court found that they were not actually manipulative because they did not bring about artificial prices for LTV stock. *Id.* As the court explained throughout its opinion, the prices of LTV stock created by defendant's short sales were not artificial because they moved the price of the shares towards their "true" or "objective" value as determined by the reorganization plan (as opposed to the defendant's alleged misconduct). Based on the foregoing, the court affirmed the district court's decision to dismiss plaintiffs' claims.

Having discussed the Defendants' principle piece of authority, the Court will now explain why this matter is inappropriate for interlocutory review.

### a. Question of Law

Proposed "Question Two" fails because it is not a question of law. [91] at 1. A district court may only certify an issue under Section 1292(b) if it turns "on a pure question of law, something the court of appeals could decide quickly and cleanly without having to study the record." *Ahrenholz*, 219 F.3d at 676-77. This normally

means "a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine." *Id*. at 676.

Question Two is: "whether, when a defendant's purchases in the futures market cause cash and futures market prices to converge, those converging prices are 'artificial' for purposes of those same statutory provisions and regulations." [91] at 1. As their basis for Question Two, the Defendants cite to *Sullivan & Long*, 47 F.3d at 865. They argue that an "essential point" of *Sullivan & Long* is that "conduct that causes convergence as the contract nears expiration and the delivery period does not create artificial prices—it eliminates them." *Id*. As such, because the prices of cash wheat and futures wheat converged, the theory goes, Defendants claim the price was not artificial.

Question Two is not a question of law because there is an essential factual predicate that must be determined by the appellate court before making any meaningful decision regarding convergence. In *Sullivan & Long*, the Court made its price artificiality decision based upon the understanding that the "central objective of securities regulation" is to "promote the convergence of market and economic values." *Sullivan & Long*, 47 F.3d at 862. The court had access to the reorganization plan in the record before it, *see* Brief of Appellees, 1994 WL 16179722, at *9 (C.A.7) (citing to the Reorganization Plan), and the Complaint before the district court had specifically explained that the shares of LTV would be worth 3-4 cents at most during the post-conversion time period. Am. Comp. ¶¶ 20, 21. Thus, the court had a record before it establishing that the "objective" or "true"

value of the LTV stock was 3-4 cents. Using that information, the court could and did find that because defendants' actions had moved the stock price in the direction of the "objective" or "true" value of the stock, those actions had not created an artificial price. Instead, they had helped the market operate more efficiently by bringing the market value of the stock in line with its true value. The court was able to reach its decision because it possessed a clear factual predicate (*i.e.*, the true value of the stock).

Because such information is missing here, any answer to Defendants' second question would necessarily involve a factual determination. In other words, there is no evidence before the Court (nor any allegation in the Complaint assumed to be true for the purposes of a motion to dismiss) that either the price of cash wheat or the price of futures wheat moved towards their objectively true value. To the contrary, the Complaint alleges the opposite. Consequently, if the Seventh Circuit were to make a decision regarding price artificiality based upon *Sullivan & Long*'s guidance concerning the convergence of market prices with true prices, it would need some factual predicate to know what those "true" prices were. Ultimately, that is a factual determination (and a complex one at that) which remains pending in the litigation. As such, the Defendants' Question Two is not a pure question of law.

Before moving on, the Court must anticipate one potential response to its reasoning here. The Defendants' argument could ostensibly be as follows: (1) a convergence between cash and futures prices is the equivalent in the futures

market of a stock's movement towards its true value for purposes of the *Sullivan & Long* price artificiality analysis; and (2) the appellate court would not need to make any factual determination regarding convergence because convergence is clear from the face of the complaint. This argument fails on its first supposition, as it stretches the holding in *Sullivan & Long* beyond its breaking point and the facts presented.

As this Court has explained, *Sullivan & Long* states two propositions as to price artificiality. First, it cites the Supreme Court for the proposition that artificial prices are generally those that "do not reflect the underlying conditions of supply and demand." *Sullivan & Long*, 47 F.3d at 862 (citing *Hochfelder*, 425 U.S. at 199. Second, it finds that the specific prices at issue before it were not artificial, because they were moving in the direction of the "objective" or "true" value of the stock as set by the reorganization plan. *Id*. It appears from the court's opinion that it reached this decision not on any overt analysis of supply and demand, but rather upon the basis that there existed an objectively true price value in the record. *Id*. In fact, the court indicates that prices set by supply and demand that were inconsistent with the "true" value were actually artificial. According to the court, the "only artificial prices" were the prices "at which LTV stock sold between the confirmation of the plan and the expiration of the old stock." *Id*. They were "artificially high because they so greatly exceeded the stock's true value, which was only 3 to 4 cents." *Id*. Yet these prices, though they exceeded the eventual post-conversion "true" value of the stock, were presumably set by the natural supply and

demand of all traders active in the market during the time period prior to conversion. Hence, the court in *Sullivan & Long* actually supports the proposition that a price set by supply and demand can be an artificial price if, under certain circumstances, it differs from some objectively "true" price. *Id*. Obviously, at this stage, this Court is not reading the *Sullivan & Long* opinion as overturning the generally accepted rule that artificial prices are those that do not reflect underlying conditions of supply and demand. *See Sullivan & Long*, 47 F.3d at 862; *Hershey v. Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 955 (N.D. Ill. 2010); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995); *U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 533 (S.D.N.Y. 2014); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971). Instead, this Court is simply illustrating an additional way in which – under specific circumstances – a court may need to evaluate price artificiality based upon a complete factual record and the goals underlying securities regulations.

The Court declines to read *Sullivan & Long*, however, so broadly as to mean that – where the price for wheat futures and cash wheat converged here – there can never be an artificial price. This would fly in the face of the general rule that price artificiality is based upon an analysis of supply and demand. Any such analysis in this matter would involve factual determinations that would be improper at this stage of the litigation.

The Court's decision not to blindly impose an overly-broad reading of *Sullivan & Long* on the specific set of facts here is supported by a comparison of the

Securities Exchange Act of 1934 (at issue in *Sullivan & Long*) with the Commodities Exchange Act (at issue here). The principle thrust of the *Sullivan & Long* opinion was that the goal of securities regulation was to "promote the convergence of market and economic values." Because the defendant's short selling had brought the price of the LTV stock in line with the "objective" or "true" value of the stock (3-4 cents), it did not violate the securities laws. According to the Court, "the essential point" of the opinion was that "since the conduct in which [defendant] engaged appears to have served rather than disserved the fundamental objectives of the securities laws, we are not inclined to strain to find a violation of a specific provision." *Id*. at 865.

The Commodities Exchange Act, however, does not have the exact same purpose as the securities laws addressed in *Sullivan & Long*. According to the Eleventh Circuit, the CEA "is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." CFTC v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321, 1329 (11th Cir. 2002). This is supported by the language of the CEA itself, which lists its purpose as follows:

> It is the purpose of this chapter to serve the public interests described in subsection (a) of this section [providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities] through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission. To foster these public interests, it is further the purpose of this chapter to deter and

12

prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants. 7 U.S.C. § 5(b).

The purpose of the CEA, then, is broader than the purpose of the securities laws examined by the court within the context of *Sullivan & Long*. This adds to the Court's hesitance to adopt the Defendants' reading of *Sullivan & Long*'s fact-specific holding to the matter currently at issue. For all of the foregoing reasons, the Court finds that Defendants' second question is not a pure question of law as required to grant interlocutory appeal on that question.

### b. Contestable

To prevail on their motion, Defendants must also show that the issues addressed in their proposed questions are "contestable." Where, as here, a controlling court has not "definitively decided an issue, the party requesting certification must demonstrate that a 'substantial likelihood' exists that the district court ruling will be reversed on appeal." *Padilla v. DISH Network L.L.C.*, No. 12-CV-7350, 2014 WL 539746, at *5 (N.D. Ill. Feb. 11, 2014) (citing *In re Brand Name Prescription Drugs Antitrust Litigation*, 878 F. Supp. 1078, 1081 (N.D. Ill. 1995)). Defendants have not satisfied that test here.

### i. Question One

As explained above, Defendants first proposed question is "whether a defendant's large futures position, coupled with an alleged intent to affect market prices but absent any other false communications to the market, constitutes 'false

signaling' market manipulation under §§ 6(c)(1) or 9(a)(2) of the Commodity Exchange Act ("Act") and corresponding Regulations 180.1 and 180.2." In arguing that this issue is contestable, Defendants claim that in "the closely analogous case of *Sullivan & Long*, the court held that short selling is neither deceptive nor manipulative absent other representations, actual or implicit, even where the trader intends to depress the stock price." Cite at 6. Defendants suggest that this Court should have relied upon *Sullivan & Long* and found that some sort of false communication or other misrepresentation is required to state a claim for market manipulation under §§ 6(c)(1) or 9(a)(2).

Under Section 9(a)(2), manipulation has been described as: (1) the "intentional exaction of a price determined by forces other than supply and demand," *Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir. 1991), or (2) the "creation of an artificial price by planned action, whether by one man or a group of men." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995) (citing *General Foods Corp. v. Brannan*, 170 F.2d 220, 231 (7th Cir. 1948). Manipulation in practice, however, often "defies easy description" and thus manipulation cases "tend to be characterized by fact specific, case-by-case analysis." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995); *Frey*, 931 F.2d at 1175 (the "'know it when you see it' test may appear most useful"). Indeed, "Congress' decision to prohibit manipulation without defining it apparently arose from the concern that clever manipulators would be able to evade any legislated list of proscribed actions or elements of such a claim." *In re Soybean Futures Litig.*, 892

F. Supp. at 1044. Because the "methods and techniques of manipulation are limited only by the ingenuity of man," the test for manipulation must be a practical one aiming to "discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand." *Premium Plus Partners, L.P. v. Davis*, 653 F. Supp. 2d 855, 876 (N.D. Ill. 2009) (citing *Cargill v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971)), *aff'd sub nom. Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533 (7th Cir. 2011).

In light of the foregoing, courts have articulated a four part test for price manipulation under Section 9(a)(2). Plaintiff must allege that: (1) the defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendants caused the artificial price; and (4) the defendants specifically intended to cause the artificial price. I*n re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 801 F.3d 758, 764-65 (7th Cir. 2015).

Based upon such precedent, this Court rejects Defendants' contention that *Sullivan & Long* supposedly requires a fifth requirement to state a claim under Section 9(a)(2), namely, some type of misrepresentation. Specifically, Defendants misread *Sullivan & Long* and ignore the above cited case law describing the requisite fact-specific approach.[1] First, *Sullivan & Long* explained that the essence of the Section 9(a)(2) offense is "'creating a false impression of supply or demand' for

---

[1] The Court again notes, as explained Section I(a) regarding "Question of Law," that *Sullivan & Long* was driven primarily by the facts presented and the purposes of the securities laws, and those facts and purposes do not align conterminously with this case or the purposes of the CEA. As such, this Court remains reluctant to adopt the Defendants' broad reading of *Sullivan & Long*.

example through wash sales." *Sullivan & Long*, 47 F.3d at 864 (citing *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977)).  While the court confined its analysis to wash sales, it did not hold or otherwise imply that the wash sales example was the only way a party could create a false impression of supply or demand.  The court ultimately based its Section 9(a)(2) decision upon the following facts: (1) that there had been no wash sales; (2) that no representations had been made; and (3) that – more generally – defendant's conduct helped achieve the goals of the securities laws.  As such, at the very least, there are two alternate ways to plead a claim for price manipulation under Section 9(a)(2): (1) by alleging that defendant created a false impression of supply and demand (through wash sales or other means); or (2) by alleging that defendant made some sort of improper representation.  This is in line with the case law cited earlier in this Opinion explaining what types of conduct Section 9(a)(2) is intended to preclude, and what is required to plead a claim under Section 9(a)(2).  As the Court explained in detail in its December 18, 2015 Memorandum Opinion and Order, [87], Plaintiff has adequately plead each of those elements, and the Seventh Circuit opinion in *Sullivan & Long* does nothing to alter that conclusion.

As to Plaintiff's claim for manipulation under Section 6(c)(1), Defendants advance the same argument as they did regarding Section 9(a)(2).  In essence, Defendants claim that *Sullivan & Long* and other cases require some sort of "false communication" in order to state a viable manipulation claim under Section 6(c)(1).  Their argument again overstates *Sullivan & Long*.  The Seventh Circuit specifically

16

explained that plaintiff's Rule 10b-5[2] claim requires "proof of *either* deception **or** manipulation." *Sullivan & Long*, 47 F.3d at 865 (emphasis added). Based upon the court's analysis, it is clear that there is a class of manipulation claims that is not based upon deception or misrepresentation. *Id.* The only reason *Sullivan & Long* did not find such manipulation was because the record established that the defendant's conduct moved the price of the LTV stock towards its true or objective value. This fact-specific finding does not apply to the case before this Court. The Court cannot, based upon the clear language of *Sullivan & Long*, find that an affirmative false communication or misrepresentation is somehow required to state a manipulation claim under Section 6(c)(1).

This finding is supported by Judge Chang's well-reasoned decision in the *Ploss* class action matter brought against Defendants based upon the same dispute at issue here. *See Ploss v. Kraft Foods Grp., Inc.*, No. 15 C 2937, 2016 WL 3476678, at *6 (N.D. Ill. June 27, 2016). There, Judge Chang persuasively explained as follows:

> *Sullivan*, however, did not hold that a market manipulation claim in the securities context always requires an explicit misrepresentation. Although it is true that "most forms of manipulation involve deception in one form or another," Rule 10b-5 "requires proof of either deception or manipulation." 47 F.3d at 865 (emphasis added) (citations and internal quotation marks omitted); see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994) ("[Section] 10(b) . . . prohibits only the making of a material misstatement (or omission) *or* the commission of a manipulative act."

---

[2] As the Court explained in its December 12, 2015 Memorandum Opinion and Order, [87], case law interpreting Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 is generally persuasive in interpreting Section 6(c)(1). This does not, however, dispel the significance of the court's focus upon the specific "purposes" of the securities laws in *Sullivan & Long*, especially when the CEA does not share the exact same purposes.

(emphasis added) (citation omitted)). This interpretation is consistent with the text of Section 10(b), which plainly prohibits "any manipulative *or* deceptive device." 15 U.S.C. § 78j(b) (emphasis added). Similarly, the corresponding regulation makes it unlawful "(a) To employ any device, scheme, or artifice to defraud" *or* "(b) To make any untrue statement of a material fact or to omit to state a material fact." 17 C.F.R. 240.10b-5. The statute and regulations themselves thus recognize a difference between two types of unlawful actions: manipulative acts and explicit misrepresentations.

Based upon this Court's analysis of the governing case law, including *Sullivan & Long*, and its review of Judge Chang's decision in *Ploss*, the Court cannot find that there is a "substantial likelihood" its decision will be reversed. Thus, Question One is not contestable under *Ahrenholz* and 28 U.S.C. § 1292(b).

### ii. Question Two

Defendants' second question is similarly unfit for immediate appeal because it is not "contestable." Defendants argue that, again citing *Sullivan & Long*, "conduct that causes convergence as the contract nears expiration and the delivery period does not create artificial prices – it eliminates them." [91] at 8-9. As explained above in Section I(a), this is an unreasonable extrapolation of *Sullivan & Long*'s fact-specific finding. There, the Court did not find that convergence between cash wheat prices and futures wheat prices could never create an artificial price. Nor did it find that market convergence generally could not create an artificial price. The Court found that there was no artificial price when a pre-determined "objective" or "true" value of a stock existed, and the actions of the defendant in that case moved the price of the stock in that direction, thus aiding the objectives of the securities laws to promote the convergence of economic and market value. Here, there is no objectively correct price for either the cash wheat or the futures wheat

established in the record. And the Court, as already explained, will not read the fact-specific holding in *Sullivan & Long* to mean that convergence between cash wheat and futures wheat can never create an artificial price. To do so would be to improperly extend the reasoning in *Sullivan & Long*. Thus, there is not a substantial likelihood that the Court's decision will be reversed.

### c. Expedite Resolution of the Litigation

Question Two also fails the *Ahrenholz* test in that its resolution would not "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Neither the "statutory language nor the case law requires that if the interlocutory appeal should be decided in favor of the appellant the litigation will end then and there, with no further proceedings in the district court." *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012). What is required, however, is that an immediate appeal will expedite rather than protract the resolution of the case. *Id*. Here, the resolution of Defendants' question would not expedite the resolution of the litigation because it would not expedite Plaintiff's claim for attempted manipulation in Count II, nor would it do anything to resolve Counts III and IV.

Attempted manipulation under Sections 9(a)(2) and 6(c)(3) requires only proof that Defendants: (1) intended to affect the market price; and (2) made some overt act in furtherance of that intent. *U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.*, 507 F. Supp. 2d 45, 51 (D.D.C. 2007); *CFTC v. Amaranth Advisors*, LLC, 554 F. Supp. 2d 523, 532 (S.D.N.Y. 2008); *CFTC v. Johnson*, 408 F. Supp. 2d 259, 267 (S.D. Tex. 2005). Defendants' proposed Question Two concerns

only the existence of an artificial price, which is not an element of a claim for attempted manipulation. Thus, the resolution of the second question would not affect Plaintiff's attempted manipulation claim in Count II. This is particularly problematic for the Defendants, because the conduct underlying the attempted manipulation claim (which will survive regardless of the potential appellate outcome regarding Question Two) is the same conduct that forms the basis for Plaintiff's Section 6(c)(1) manipulation claim in Count I, and the perfected manipulation part of Count II. Thus, a great deal of the discovery that may be saved if Question Two were to be answered favorably for Defendants on appeal would nonetheless have to be completed in relation to Plaintiff's attempted manipulation claim. Thus, the Court finds that the resolution of Question Two would not materially advance the ultimate termination of litigation.

In light of the foregoing, the Court finds that this matter is inappropriate for interlocutory appeal. The questions proposed by the Defendants do not satisfy the requisite elements for appeal, and their motion [90] is therefore denied.

## II. Plaintiff's Motion to Strike Affirmative Defenses

Also before the Court is Plaintiff's motion to strike all five of the Defendants' affirmative defenses. [94]. In their response brief, Defendants have conceded that their first, second and fifth affirmative defenses are improper. Those affirmative defenses are stricken with prejudice. Further, at the March 10, 2016 status hearing, the Defendants indicated that they would withdraw their third affirmative defense. That affirmative defense is also stricken with prejudice. This leaves only

affirmative defense four to address in this Opinion. Affirmative Defense Four states that Plaintiff's claims relating to "Count IV must fail because of Plaintiff's unclean hands and are barred by the doctrine of Laches." [88] at 27.

Under Rule 12(f), the Court may strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). "Affirmative defenses will be stricken 'only when they are insufficient on the face of the pleadings.'" *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991) (quoting *Heller Fin. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989)). It is appropriate, however, "for the court to strike affirmative defenses that add unnecessary clutter to a case." *Davis v. Elite Mortgage Servs.*, 592 F. Supp. 2d 1052, 1058 (N.D. Ill. 2009). Also, because affirmative defenses are "subject to the pleading requirements of the Federal Rules of Civil Procedure, they must set forth a 'short and plain statement' of all the material elements of the defense asserted; bare legal conclusions are not sufficient." *Id.* This Court – along with many others in this district – examines affirmative defenses by reference to *Twombly*'s "plausibility" pleading standard. *See, e.g., State Farm Fire & Cas. Co. v. Electrolux Home Products, Inc.*, No. 10 C 7651, 2011 WL 133014 (N.D. Ill. Jan. 14, 2011); *Edwards v. Mack Trucks, Inc.*, 310 F.R.D. 382, 386 (N.D. Ill. 2015) ("While the Seventh Circuit has not addressed whether the *Twombly–Iqbal* standard applies to affirmative defenses, judges in this district have generally found these requirements to apply"). District courts have considerable discretion under Rule

12(f).  *See Delta*, 554 F.3d at 1141-42.  Here, the Defendants allege the affirmative defenses of unclean hands and laches in their fourth affirmative defense.  The Court will address each in turn.

### a.  Unclean Hands

While the Seventh Circuit has not definitively addressed whether the affirmative defense of unclean hands may be asserted against a government agency in an enforcement action to protect the public interest, the great weight of authority shows that it may not.  *See CFTC v. U.S. Bank, N.A.*, No. 13-cv-2041, 2014 WL 6474183, at *35 (N.D. Iowa Nov. 19, 2014); *U.S. v. Philip Morris*, 300 F. Supp. 2d 61, 75 (D.D.C. 2004); *U.S. v. Am. Elec. Power Serv.*, 218 F. Supp. 2d 931, 938 (S.D. Ohio 2002); *SEC v. Hayes*, No. CA 3-90-1054-T, 1991 WL 236846, at *2 (N.D. Tex. July 25, 1991); *SEC v. Weil*, 79-440 CIV-T-H, 1980 WL 1417, at *1 (M.D. Fla. Feb. 7, 1980); *SEC v. Rivlin*, No. 99-1455, 1999 WL 1455758, at *5 (D.D.C. Dec. 20, 1999); *SEC v. Follick*, No. 00 Civ. 4385, 2002 WL 31833868, at *8 (S.D.N.Y. Dec. 18, 2002); *Sonowo v. United States*, No. Civ. A. 03-1122-GMS, 2006 WL 3313799, at *3 (D. Del. Nov. 13, 2006).  These decisions are based upon the principle – articulated by the Supreme Court – that though the United States is subject to the general principles of equity, equitable principles "will not be applied to frustrate the purpose of [the United States'] laws or to thwart public policy."  *Pan–Am. Petroleum & Transp. Co. v. United States*, 273 U.S. 456, 506 (1927).

As such, courts frequently grant government motions to strike unclean hands affirmative defenses.  *See, e.g., SEC v. Cuban*, 798 F. Supp. 2d 783, 797 (N.D. Tex.

2011); *U.S. v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d 763, 774 (N.D. Tex. 2002); *Rivlin*, 1999 WL 1455758, at \*5-7;  *Hayes*, 1991 WL 236846, at \*2;  *SEC v. Lorin*, No. 90 Civ. 7461 (PNL), 1991 WL 576895, at \*2 (S.D.N.Y. June 18, 1991). This Court is persuaded by the vast majority of case law that – as a matter of law – the unclean hands defense is not available in actions brought by the government in the public interest.   To the extent it alleges the affirmative defense of unclean hands, affirmative defense four is stricken.

Defendants attempt to counter this holding by citing to two cases from the Northern District of Indiana.   Those cases, however, are readily distinguishable. Although the court in *United States v. Martell*, 844 F. Supp. 454 (N.D. Ind. 1994), initially declined to strike defendants' equitable affirmative defenses (including unclean hands), the court later struck them as a matter of law after the Seventh Circuit ruled that they are not available against the government.   The Court explained: "In his Answer, Martell also asserted a number of equitable defenses to this CERCLA action. However, such defenses clearly have been foreclosed with the Seventh Circuit's pronouncement in *Town of Munster v. Sherwin–Williams Co.*, 27 F.3d 1268, 1270 (7th Cir.1994), that equitable defenses are insufficient and unavailable as defenses to a liability claim under CERCLA section 107. Accordingly, these defenses must be stricken as a matter of law from the Answer." *U.S. v. Martell*, 887 F. Supp. 1183, 1192 (N.D. Ind. 1995).

Likewise, *United States v. Walerko Tool & Eng'g Corp.*, 784 F. Supp. 1385 (N.D. Ind. 1992), involved claims brought under section 107 of CERCLA, and a

motion to strike equitable affirmative defenses as in the Martell case. *Walerko*'s decision not to strike the equitable affirmative defenses occurred in 1992, prior to *Martell* and the Seventh Circuit's ruling in *Town of Munster*. Consequently, the *Walerko* ruling is no longer good precedent, nor is it persuasive here. Therefore, an unclean hands affirmative defense is unavailable here as a matter of law, and affirmative defense four is stricken to the extent it relies upon unclean hands.

### b. Laches

Laches "bars a party's rights when the party has unreasonably delayed their assertion so as to cause prejudice to the opposing party." *Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 181 (7th Cir. 1994). When the action brought by the government, however, is "an enforcement action where the government asserts its own rights, it falls within the general rule that 'the United States is not subject to the equitable defense of laches in enforcing its rights.'" *S.E.C. v. Fisher*, No. 07 C 4483, 2009 WL 780215, at *2 (N.D. Ill. Mar. 20, 2009) (quoting *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1090 (7th Cir.1992)). The cases cited by the Defendants allowing the defense of laches are distinguishable in that they involved, or were based upon cases analyzing, the government's pursuit of a private right of action. *See NLRB v. P*I*E Nationwide, Inc.*, 894 F.2d 887 (7th Cir. 1990); *Resolution Trust Corp. v. Vanderweele*, 833 F. Supp. 1383 (N.D. Ind. 1993) (citing *FDIC v. Knostman*, 966 F.2d 1133, 1139 (7th Cir.1992)). That is not the case here. Precedent clearly shows that the general rule articulated above applies to

enforcement actions such as this. Therefore, affirmative defense four is stricken to the extent it relies on laches.

## III. Conclusion

As explained above, Defendants' motion for interlocutory appeal and stay [90] is denied, and Plaintiff's motion to strike affirmative defenses, [94] [95], is granted. All of Defendants' affirmative defenses are hereby stricken. Pursuant to the Court's July 8, 2016 minute order, [112], the close of written discovery is set for September 8, 2016. This matter is set for a status hearing on at 9:45 a.m., on September 8, 2016 in Courtroom 1725. The parties should come prepared to set additional case management dates.

IT IS SO ORDERED

Dated: July 19, 2016

John Robert Blakey
United States District Judge