## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>KRAFT FOODS GROUP, INC. and MONDELĒZ GLOBAL LLC<br><br>    Defendants. | Case No. 15 C 2881<br><br>Honorable John Robert Blakey |

**JOINT STATUS REPORT ON RESULTS OF MEET AND CONFER CONCERNING KRAFT'S MOTION TO COMPEL DIRECTED AT NON-PARTY ADM**

On July 17, 2017, Defendants Kraft Foods Group, Inc. and Mondelēz Global, LLC (collectively "Kraft") filed a Motion to Compel (Dkt 164) and supporting Memorandum (Dkt 166), asking this Court to compel non-party Archer Daniels Midland Corporation ("ADM") to provide six categories of additional information requested in a Kraft subpoena served on ADM.

On August 15, 2017, ADM filed a memorandum opposing Kraft's Motion to Compel (Dkt 181).

This Court held a hearing on the Motion to Compel on August 17, 2017, after which it issued an Order (Dkt 182) directing the parties to meet and confer on the issues raised by the Motion to Compel. Counsel for Kraft and for ADM have held several telephone conversations between August 17 and the date of this filing, and this Joint Status Report details the progress that Kraft and ADM have made on the issues raised by Kraft's Motion to Compel.

### The Categories of Requested Information, the Progress Made, and Open Issues

**Category 1**: Brokerage account statements, trading records, or similar documents sufficient to show ADM's daily positions and trades in the CBOT No. 2 SRW wheat futures contract.

1

ADM Position: ADM offers to produce a regularly prepared report – a "futures report" or "hedge report" -- that reflects the daily futures positions held by ADM's Toledo warehouse. After discussion, ADM also offers to produce this information for its Ottawa Lake, Michigan warehouse, which is in the Toledo area.

Kraft Response: Although the ADM offer does not encompass brokerage account statements or trading records, and would provide no information on individual trades, Kraft is willing to accept a complete set of futures reports for the relevant period (June 1, 2011 to December 31, 2011). But those daily reports must encompass the entire ADM operation, not merely the Toledo warehouse.

Kraft needs reports or records that show ADM's daily trading activity for every location. The information as to futures positions is relevant to this dispute because it provides a clear indication about how one major participant in the wheat futures market responded to conditions that, at least according to the CFTC's complaint, Kraft was somehow manipulating. The CFTC asserts that Kraft supposedly sent a signal to the market by its trading. Daily reports are essential to understanding how one of the central suppliers understood and reacted to this dynamic market. Kraft needs to be able to see ADM's actual trades, the dates on which they occurred, and the price and volume of those trades, especially during the delivery periods, to determine whether ADM's trades impacted futures prices or impacted the spreads between futures prices.

The information also should be corporate-wide. Although Kraft's participation in the cash wheat market focused on cash wheat to be purchased at locations near to its facility (such as Toledo), transactions in the futures market are not similarly limited as to location. The CFTC's allegations concern the entire CBOT wheat futures market—not the Toledo trading market. In fact, there is no "Toledo market." The CBOT wheat contract is a single market that sits in Chicago,

regardless of the physical location of the traders. Moreover, Kraft's defense notes that when a party, like Kraft, enters into a futures contract to acquire wheat, that party does not know and has no control over where the wheat will be delivered. Nearly every other grain elevators has produced brokerage statements showing daily positions, without the data being linked to a single location.

ADM Response: As Kraft conceded at the initial hearing of this motion, the only specific tie that Kraft has identified between ADM and this case is that Kraft made two purchases of wheat from ADM during the period in 2011 for which Kraft is seeking discovery. (Tr., p. 5.) Kraft also stated that what it was most interested in was cash transactions out of Toledo where Kraft purchases wheat, and that it was a relatively localized market in Toledo. (Tr., pp. 5, 17.)

Consistent with these representations to the Court, ADM has agreed to provide Kraft with reports of its futures hedging transactions for its Toledo warehouse. Kraft has identified another ADM warehouse in Ottawa Lake, Michigan, which is part of the greater Toledo market, and ADM is also willing to provide reports of its hedging transactions for Ottawa Lake.

Nevertheless Kraft is insisting on all of ADM's company-wide futures hedging transactions for its 150 plus locations, none of which, outside of Toledo, has any relationship to this case. This is an overbroad request that the Court should deny.

Kraft's asserted reasons for seeking this information should be rejected. Kraft said it needs to know how a major participant responded to conditions that, according to the CFTC complaint, Kraft was manipulating. But that alleged need is not grounded in the complaint. The CFTC did not allege that ADM or any other specific market participant specifically reacted to Kraft, but rather that Kraft intended for the market to react to Kraft's actions. (Dkt. 1, para. 34.) The market involves much more than ADM, and information as to the market as a whole can be obtained by

Kraft from the plaintiff CFTC or publicly available sources such as the data sold by the Chicago Mercantile Exchange.

Moreover the complaint also alleges that the reaction that Kraft intended for the market was to lower the price of cash wheat available in the Toledo area, which would allow Kraft to obtain wheat in the cash market at more favorable prices. (Dkt. 1, para 34.) ADM is willing to provide Kraft information relating to its cash prices in the Toledo area and the related futures.

Kraft's apparent reason, as now explained in this report, is to try to bring ADM and possibly other market participants into this case where Kraft, and not ADM, has been accused of wrongdoing. Kraft says it needs to "determine whether ADM's trades impacted futures prices or impacted the spreads between futures prices." There has been no allegation to this effect and there is no basis for such an allegation. Therefore this is not a valid basis for discovery but rather is a pretext for a fishing expedition which is trying to deflect attention from Kraft, the defendant in this case, to ADM, which, unlike Kraft, has not been accused of any wrongdoing. Moreover, there is not even a logical basis to connect ADM's trading with Kraft's market activities, because ADM, as a hedger of physical commodities, is basing its trades on its commitments in the physical market, and there is no basis for Kraft to connect them to Kraft's conduct.

ADM is willing to provide records of its futures trades related to the Toledo market, including both Toledo and Ottawa Lake, where Kraft buys wheat. Kraft is not entitled to more, and the Court should not order more.

Furthermore, whatever other grain merchants have produced or not produced to Kraft is irrelevant and is outside the record in this case in any event. Other grain companies may have reached a settlement with Kraft regarding production of documents for their own business reasons, and not because they were legally obligated to provide information sought by Kraft. Those reasons

are not in the record of this case and are irrelevant to the issues this Court has before it. Kraft's continued references to what it has obtained from other grain companies are irrelevant and should be disregarded by this Court.

**Category 2**: Documents showing ADM's revenue, by month, related to its storage of SRW wheat, as well as documents discussing the CBOT variable storage rate ("VSR").

ADM Position: ADM proposes to produce nothing in response to this request, arguing that it does not keep records of storage revenue. Given that much of the wheat it stores is wheat that ADM itself originates or sources, and that ADM does not charge itself storage fees, ADM suggests that it has no relevant, responsive information.

Kraft Response: Kraft believes that this request is broader than ADM's response suggests; ADM likely has records of storage revenue earned by charging other entities for storage and documents discussing the VSR. Nevertheless, Kraft is willing to accept ADM's position and not seek further production of Category 2 information.

**Category 3**: Documents showing the quantity, locations, and registration dates for SRW wheat that ADM registered for delivery, or took delivery of, against the CBOT wheat futures contract, as well as inspection reports for any wheat loaded-out against such futures contracts.

ADM Position: ADM offers to provide a weekly report for the Toledo warehouse that shows that warehouse's deliverable and non-deliverable stocks of wheat. By comparing the stocks from one week to the next, the reader of this report will be able to discern whether, on a net basis, ADM has added to its stocks by taking delivery, or depleted its stocks by completing delivery.

Kraft Response: The stock reports ADM offers to produce are of limited or no value. Kraft is not insisting upon records of every contract that ADM registered for delivery. From other sources, Kraft can obtain information about when and where ADM <u>registered</u> receipts for delivery.

5

What Kraft cannot determine, however, is whether the contract that is registered for delivery is loaded out, sold back to the issuer, or re-sold into the futures market. Kraft has no insight into what happened to the wheat that ADM delivered or received by standing for delivery. It is vital to Kraft's defense that it obtain discovery as to transactions that resulted in an actual delivery of wheat. The CFTC has alleged that Kraft never actually intended to stand for delivery of the wheat covered by the September and December 2011 futures contracts, because the market conditions were such that standing for delivery would have been un-economical, because Kraft could not have expected to receive wheat in Toledo. Kraft vehemently disputes this contention, and intends to support its defense by showing that other market participants were considering, or actually standing for delivery, under those same futures contracts. If it was economically rational for other market participants, like ADM, to take delivery under the futures contracts, then it was likewise rational for Kraft to consider taking such deliveries. The CFTC has also alleged that the market would have expected Kraft to load out wheat. But Kraft believes that the vast majority of deliveries are never loaded out. Kraft needs information as to ADM's deliveries. In addition, ADM decisions about making or standing for delivery – and where to do so – affect the basis and price of futures and futures spreads. Kraft also needs to show that a trader standing for delivery has a number of options other than loading out, such as reselling or redelivery the certificates.

As in the discussion of Category 1, this request necessarily encompasses all of ADM's operations and locations, as ADM may make delivery at any regular-for-delivery location it selects, and must take delivery at whatever regular-for-delivery location its counter-party selects. But this does not mean, however, that the request is necessarily broad. First, ADM does not have that many facilities that are regular-for-delivery. Second, even for a company of ADM's size, the number of deliveries taken or made pursuant to futures contracts is not large. Third, these

6

deliveries occur over a narrow window of time, typically about two weeks, in connection with each futures contract. The relevant window here (June through December 2011), will encompass some deliveries made or taken under the June 2011, September 2011 and December 2011 futures contracts.

ADM Response: ADM made a good faith offer to provide its weekly report regarding the deliverable stocks it had in Toledo during the relevant period. After discussion, ADM is willing to provide Ottawa Lake information as well. Instead, Kraft wants information regarding every delivery ADM made or took, company-wide, in June through December 2011. But Kraft can readily obtain, from the Chicago Mercantile Exchange, information regarding all deliveries made and taken by all traders. There is absolutely no basis for singling out ADM, which is not alleged to have done anything relevant with respect to deliveries, other than to give Kraft another company to try to include in its own problem.

Kraft asserts, without any basis, that the number of deliveries made or taken by ADM is not large. ADM has not retrieved all of its records that relate to possible deliveries, because that itself is a burden that ADM should not have to undertake. Discussions with company officials indicate any such effort would be extremely burdensome and time consuming, and at many individual locations records my no longer exist. If Kraft wants to analyze the impact of deliveries by others, it can get records of the dates and volume of all deliveries from the Chicago Mercantile Exchange, and there is no basis to single out ADM to produce its delivery records.

ADM has offered to produce its futures transactions and its weekly deliverable stocks reports for Toledo and Ottawa Lake. That is the market relevant to this case, and Kraft should not be granted access to ADM's company-wide delivery records.

7

**Category 4**: Documents sufficient to show bids to buy, and offers to sell, wheat in the cash market received by ADM. (Through communications with ADM Kraft understands that ADM may not keep "daily official bids sheets or offer sheets," but Kraft has seen bid/offer information reflected in e-mails which involved ADM personnel, so an e-mail search by ADM should provide documents responsive to this request).

ADM Position: ADM offers to search for documents in the files of the person(s) responsible for making cash offers and receiving cash bids. This will not be an e-mail search.

Kraft Response: As to the cash purchase and sales data, Kraft believes that a spreadsheet produced by ADM in its initial response to Kraft's subpoena is sufficient.

As to e-mail searches regarding bids and offers, Kraft is willing to forego emails about bids to further narrow its request. Kraft still needs information about offers, particularly offers to sell wheat in the Toledo region (including Ottawa Lake), to establish that the wheat prices available to Kraft were high in the second half of 2011. Kraft's proposed terms to discover those emails containing offers to sell are contained in the email proposal set forth below.

ADM Response: ADM agrees that the spreadsheet is sufficient to show cash sales for every ADM location in the Toledo switching district. In addition, ADM has agreed to search its non-email records for bids and offers for physical wheat for the Toledo warehouse and is willing to extend that to the Ottawa Lake warehouse. This, together with the spreadsheet that has already been produced, should be sufficient to provide Kraft with information concerning cash transactions in the Toledo area.

**E-Mail Searches: Categories 4 (in part), 5 and 6**

**Category 4**: E-mails relating to documents sufficient to show offers to sell wheat in the cash market received by ADM.

**Category 5**: Documents and communications (including e-mail) related to Kraft.

**Category 6**: Documents and communication (including e-mail) reflecting ADM's strategy in the cash wheat and futures wheat markets.

ADM Position: ADM objects to conducting any searches of its e-mail records.

Kraft Response: Kraft needs emails containing offers to sell cash wheat for the reasons discussed with Category 4.

Kraft needs ADM emails discussing Kraft because those emails likely bear on (1) the price of wheat available to Kraft in Toledo and/or (2) ADM's reactions to Kraft's alleged "signal," which is a key component of the CFTC's case.

The final category of emails concerns ADM's strategy regarding whether to stand for or make delivery of wheat in the futures market. The CFTC's position in this case is that standing for delivery, with the knowledge that doing so may affect the spread, is manipulative. Emails produced by other elevators show that grain elevators (like ADM) regularly consider how delivering wheat might affect the spread, especially during the delivery period. The CFTC's witnesses have also testified that Kraft should not have expected to receive December deliveries in Toledo because the cash price in Toledo was higher than the futures price. Emails produced by the Andersons, however, show that the Andersons contemplated delivering wheat in Toledo in December and nearly did so. To the extent ADM considered delivering wheat as well, it would provide further evidence that Kraft was reasonable to think it could get deliveries in Toledo in December.

In prior discussions with ADM, before the Motion to Compel was filed, Kraft proposed restricting its e-mail search to a six-month window, to the files of five custodians, and a set of search terms that had been used with another elevator (Bunge). Using those search terms across a varying number of Bunge custodians – three custodians for some terms, 11 custodians for other terms – produced a very manageable number (460) of responsive, non-privileged e-mails.

To further limit the breadth of the e-mail requests, Kraft agrees that ADM may limit the search to three custodians -- Adam Flavin, Richard Nazur, and Mark Gergen. Kraft proposes that a single search be conducted on these three custodians' e-mail files, with that search identifying documents that contain any of the following terms:

1. Offer & Wheat (Req. 4)
2. Kraft (Req. 5)
3. Deliver! (where ! is a root expander to capture deliver, delivery, delivered, etc.)
4. Spread!
5. Carry
6. VSR
7. Toledo

To the extent that any search terms yield an unacceptably high number of "false positives," Kraft will work with ADM, as it has worked with all other producing elevators, to refine the search terms. Kraft has no desire to review any documents that are not germane to the issues in the underlying lawsuit brought by the CFTC.

ADM Response: In response to the Court's request that Kraft narrow its requests, Kraft has actually broadened its requests for emails. At the hearing, Kraft asked that ADM be ordered to search five custodians for seven months for emails containing both "Kraft" and "wheat." (Tr.,

p. 8.) As shown above, Kraft now wants seven different searches instead of the one it initially requested, a significantly broader request. The search terms are intended to recover every e-mail that the custodians sent. For example, use of the term "Toledo" would capture every e-mail sent by someone in the Toledo office as it appears in their address in the e-mail signature block. The terms "Deliver!", "Spread!" and "Carry" are used in virtually every conversation a grain trader has, and would likewise capture virtually every e-mail a given grain trader or grain company employee sends or received. The Court stated at the hearing that "every single e-mail, even if you do limit it to five custodians in seven months, can be a lot of information. And going through the ESI might not give you what you need anyway." (Tr., p. 22.) Now, Kraft wants even more extensive searches than it requested at the hearing. Kraft's request is unreasonable and impermissible.

Kraft now says it will narrow the number of custodians to three instead of five. However ADM has determined and informed Kraft that of those three, only one (Gergen) is still an employee at the company, and the other two named employees left ADM well before the subpoena was served, and indeed well before the case involving Kraft arose. The e-mails of those other employees were not retained. Kraft's request is clearly a fishing expedition, with Kraft hoping to find something in emails without having any valid basis for even requesting them or searching them.

The Court should not order any email discovery. Kraft has not identified any valid basis for needing emails. It says it needs emails concerning offers to purchase cash wheat. But it has no basis for believing that Mr. Gergen bought cash wheat in Toledo, and ADM has agreed to search for non-email offers at Toledo. Kraft claims it needs emails concerning the price of wheat available to Kraft in Toledo but again has no basis for believing these would be found in Mr.

11

Gergen's emails, and in any event ADM is already producing records of actual transactions at Toledo, including those where Kraft bought from ADM. Finally, Kraft claims that it needs to know ADM's reaction to Kraft's alleged "signal," which Kraft alleges is a key component of the CFTC's case. But there is no allegation in the Complaint that ADM had any such reaction; the CFTC is alleging that Kraft intended for the market, not any particular participant, to react to Kraft's actions by lowering the cash price in Toledo. (Dkt. 1, para. 34.) Information as to the reaction of the market as a whole can be found in the records of transactions in the market as whole, which are available from the Chicago Mercantile Exchange or from the plaintiff CFTC.

The Court should also note that emails by themselves are unlikely to satisfy Kraft. Rather, based on what has occurred with other grain companies in this case, when Kraft has obtained emails, it has then sought depositions to go beyond the emails. The Court should not take a step that will likely lead to more requests for more discovery from an uninvolved non-party such as ADM.

The estimated cost to ADM of conducting email searches would be significant. For the three custodians of the original five that Kraft requested, ADM estimates that the cost could be approximately $140,000. This consists of vendor charges to process the emails, search the emails and host the emails, plus outside counsel fees for review of the emails. This is a very expensive process, and would not necessarily be significantly reduced by searching one custodian rather than three. ADM, as a third party with no connection to this case, should not be required to bear these costs where there is nothing specific of relevance to this case that has been identified as likely to be found in these emails.

Kraft's attempts to require ADM to conduct email searches is a fishing expedition, intended to involve ADM in Kraft's case. This Court should not issue a fishing license to Kraft, and should deny its request for email searches.

Date: August 30, 2017

Respectfully submitted,

By: /s/ James L. Thompson
    One of Kraft's Attorneys

James L. Thompson (IL 6199621)
Lynch Thompson LLP
150 S. Wacker Drive,
Suite 2600
Chicago, IL 60606
Telephone: (312) 346-1600
jthompson@lynchthompson.com

By: /s/ William J Nissen
    One of ADM's Attorneys

William J. Nissen
Angelo Suozzi
Sidley Austin LLP
1 South Dearborn Street
Chicago, IL 60603
Telephone: 312-853-7742
wnissen@sidley.com
asuozzi@sidley.com

## **CERTIFICATE OF SERVICE**

      I, James Thompson an attorney, hereby certify that on August 30, 2017, I served a **Joint Status Report on Results of Meet and Confer Concerning Kraft's Motion to Compel Directed and Non-Party ADM** upon all counsel of record by the Court's electronic filing system.

                                                        /s/ James Thompson