```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   U.S. COMMODITY FUTURES          )  Docket No. 15 C 02881
     TRADING COMMISSION,             )
 4                                   )
                        Plaintiff,   )  Chicago, Illinois
 5                                   )  August 31, 2017
                   v.                )  10:43 a.m.
 6                                   )
     KRAFT FOODS GROUP, INC., and    )
 7   MONDELEZ GLOBAL, LLC,           )
                                     )
 8                      Defendants.  )

 9           TRANSCRIPT OF PROCEEDINGS - Motion Hearing
             BEFORE THE HONORABLE JOHN ROBERT BLAKEY
10

11   APPEARANCES:

12   For the Plaintiff:    COMMODITIES FUTURES TRADING COMMISSION, by
                           MR. ROBERT T. HOWELL
13                         525 West Monroe Street, Suite 1100
                           Chicago, IL 60603

14   For the Defendants:   JENNER & BLOCK, LLP, by
                           MR. KEVIN McCALL
15                         353 North Clark Street
                           Chicago, IL 60654-3456
16
                           LYNCH THOMPSON, LLP, by
17                         MR. JAMES L. THOMPSON
                           150 South Wacker Drive
18                         Suite 2600
                           Chicago, IL 60606
19
     For Archer Daniels Midland Company:
20
                           SIDLEY AUSTIN, LLP, by
21                         MR. WILLIAM J. NISSEN
                           One South Dearborn Street
22                         Chicago, IL 60603

23   Court Reporter:       LISA H. BREITER, CSR, RMR, CRR
                           Official Court Reporter
24                         219 S. Dearborn Street, Room 1212
                           Chicago, IL 60604
25                         lisa_breiter@ilnd.uscourts.gov
```

1      (In open court.)

2           THE CLERK:  15 C 2881, U.S. Commodity vs. Kraft Food

3   Groups.

4           THE COURT:  Good morning, Counsel.  Appearances,

5   please.  Thank you for your patience.  I can't always control

6   how long the call goes.

7           MR. THOMPSON:  No problem.  Jim Thompson on behalf of

8   Kraft, the defendant and the movant in the motion to compel

9   that's before the Court.

10           MR. HOWELL:  Robert Howell on behalf of the CFTC.

11           MR. McCALL:  Kevin McCall on behalf of Kraft, not with

12   respect to this motion, though.

13           THE COURT:  Okay.

14           MR. NISSEN:  Good morning, your Honor.  William Nissen

15   on behalf of Archer Daniels Midland.

16           THE COURT:  How are you?  I've seen the motion and the

17   status report.  I appreciate the parties' efforts.  There

18   wasn't a lot of agreement, but I can tell there was a lot of

19   work built into it, so I appreciate that.

20           MR. THOMPSON:  Yes.

21           THE COURT:  Do you want to argue that, or do you want

22   to rely on the papers?

23           MR. THOMPSON:  I'd like to add just a little bit to

24   it.

25           THE COURT:  Yeah, go ahead.

1    MR. THOMPSON:  I don't think it's -- it's necessarily

2    easy to understand the issues around deliveries, which is the

3    focus of Category 3, and some of the e-mail discovery in

4    Category 6.  And so what we've asked for is documents relating

5    to all situations over a six-month period when ADM registered

6    certificates for delivery or took delivery of wheat pursuant to

7    futures contracts.

8    Now, we can tell from centralized CFTC records when

9    certificates are registered for delivery and when they're

10   canceled, but we can't tell anything else that happens on them.

11   After the certificate is registered, wheat can get loaded out

12   pursuant to that certificate, the elevator can cancel the

13   certificate, or the merchant who's the counter-party can hold

14   on to the certificate, and we need to know what happens in

15   those.

16   And you also need to understand, your Honor, that of

17   all the futures trades that market participants enter into --

18   elevators like ADM, merchants like Kraft -- the vast majority

19   of those certificates, those futures contracts never get

20   registered for delivery.  We're talking about a very small

21   subset here.  And the facts relating to those certificates that

22   are registered certificates for delivery are absolutely

23   critical to the case.

24   The CFTC has alleged that when Kraft entered into the

25   December 2011 futures contracts, Kraft necessarily must have

1   known that delivery under those contracts would not occur in

2   Toledo.  Delivery in Toledo was what worked best for Kraft.

3          The CFTC has alleged that Kraft must have known that

4   delivery would never take place on those certificates in

5   Toledo.  Kraft disagrees with this strenuously.  This is why

6   Kraft ran its test purchases under the September 2011 futures

7   contracts.

8          So what's absolutely critical in this case is what

9   wheat deliveries were actually being made on those certificates

10  that parties had registered for delivery on the September 2011,

11  the June 2011 and the December 2011 futures contracts.

12         Now, all of this information is isolated in just a

13  couple-week periods in connection with each of those times.  So

14  we're not even -- although the time period covered is six

15  months, all of the activity relating to whether -- when

16  certificates are registered and when delivery actually occurs

17  is concentrated in a two-week period.  There's a two-week

18  period in connection with each of those futures contracts.

19         And it's not just in the pleadings in which this issue

20  is central.  This has been a central topic in all of the

21  depositions that have taken place of the elevators so far.

22  This has been the subject of CFTC questions.  This has been the

23  subject of Kraft questions.

24         The questions have focused on who was standing for

25  delivery, what were the -- what were the impetuses that were

1   driving your decisions on whether to stand for delivery,

2   whether to register certificates for delivery and what to do

3   with those registered certificates in connection with the June,

4   September and December of 2011 futures contracts.

5            And almost all of the discovery, the questioning on

6   this -- I don't want to get into what the e-mails say because

7   they're confidential.  But much of the questioning in those

8   depositions has revolved around e-mail discovery that the

9   elevators have produced relating to certificates they

10  registered for delivery, which is why we're seeking the

11  documents that ADM has on certificates registered for delivery

12  and e-mails relating to those limited times when ADM had to

13  make decisions on what to do with certificates they had

14  registered for delivery.

15           This is absolutely information we cannot get

16  elsewhere.  We have tried.  We can -- we know who the

17  counter-parties are on certificates registered for delivery.

18  We know when they're registered for delivery, but we have no

19  idea what's happened after the certificates get canceled.

20           They can get canceled, as I said, for a number of just

21  different reasons because the wheat's loaded out, because the

22  elevator buys back the certificate, because the merchant let

23  the certificate stand without actually taking delivery, leaves

24  it at the elevator incurring additional storage charges.  We

25  have no insight into what happens to those certificates when

1    they're registered for delivery, and that's the million-dollar

2    question in our case.

3         And I've tried to explain this to ADM.  I've tried to

4    work with them in any way I can to get this information, but

5    this is information we just have -- we have to have.  Where

6    we've gotten it from other elevators, it has not been

7    voluminous.  I'm not trying to make this into a huge

8    production.  That's the last thing in the world I want.

9         But Kraft does -- this is information that is the

10   heart and soul of Kraft's defense and the CFTC's allegations,

11   which is why we've insisted on getting it from all the other

12   elevators and why all the other elevators have supplied it.

13        Our understanding is, as I've said, that the vast

14   majority of certificates that are -- that -- that parties

15   entered in -- the vast majority of futures contracts that

16   parties enter into are not registered for delivery.

17        Again, in the documents we've seen, we've seen

18   references to a handful of situations in which ADM was a

19   participant in either delivery that was made or delivery that

20   ADM took.  But we can't drill down on what happened in those

21   situations without the information from ADM.  So your Honor,

22   that's Category 3 and the e-mail discovery that relates to

23   Category 6.

24        Now let me talk just a little about --

25        THE COURT:  Let's break it up, if you're talking about

1    Category 3.  Are you seeking a more narrow set of documents

2    than in the pleadings, if you say your concern is the contracts

3    that were registered, certified for delivery rather than any

4    futures contract at all?

5              MR. THOMPSON:  What --

6              THE COURT:  'Cause what -- my understanding what you

7    were asking for were the weekly reports regarding deliverable

8    and non-deliverable stocks of wheat for the period of time.

9              MR. THOMPSON:  Let's make sure we're talking about the

10   same categories, your Honor.  Category 3 is limited to exactly

11   what I just discussed, which is the quantity, location and the

12   registration dates for SRW wheat that ADM registered for

13   delivery or took delivery of.  So Category 3, we're not talking

14   about all futures contracts.  We'll circle back to Category 1.

15             But Category 3 is limited to situations where ADM

16   registered for delivery or took delivery of certificates.  So

17   that's the small subset of all futures contracts that ADM or

18   anybody would have entered into.

19             THE COURT:  Do you want to address Category 3?  Is

20   that information contained in reports that are -- do you think

21   that there's a basis for getting each individual contract or

22   all the underlying data?

23             MR. NISSEN:  You're asking me, your Honor?

24             THE COURT:  Yeah.

25             MR. NISSEN:  Yes.  Your Honor, I believe that the

1    commercially available reports will tell Kraft when deliveries

2    were made and when deliveries were taken, and so they should

3    know every -- every delivery that was made or taken from the

4    commercially available sources.

5              THE COURT:  Yeah, that's -- they can do that all they

6    want.  The question is what ADM has.

7              Do you have weekly reports regarding what he's seeking

8    within that time period?

9              MR. NISSEN:  No, your Honor, not weekly -- the weekly

10   reports are what's in their warehouses.  And I think counsel is

11   maybe misusing the word "registered."  I think registered for

12   delivery are actual stocks that are in the warehouses that can

13   be delivered.

14             And that's what -- based on that, that's what we

15   agreed to give was our weekly reports, and Kraft said, no,

16   that's not what they want.  Now, we have agreed to give them

17   all the futures, and that would include deliverable futures out

18   of the Toledo area.  And that's what they say is the real crux

19   of their case.

20             So ADM has two facilities in the Toledo area, and

21   we've agreed, as to both of them, to give them the reports on

22   the hedging.  And those hedging contracts, to the extent

23   they're delivered upon, that -- you know, that would be the

24   information as well that would be included in that.

25             So what -- what we're opposed to is giving

1  company-wide at all locations outside of Toledo.  I think

2  that's really the issue.  So we're willing to provide it as to

3  Toledo, which is what the crux of their case is.

4        MR. THOMPSON:  Your Honor, if I could.

5        THE COURT:  Yeah, go ahead.

6        MR. THOMPSON:  The crux of our case when we take cash

7  deliveries, we take them in Toledo.  The whole purpose -- the

8  whole point of this issue, this dispute has to do with

9  elevators choosing not to deliver to us in Toledo.

10        The whole point -- the CFTC's argument is, Kraft, you

11  should have known when you entered into the December futures

12  contracts that parties like ADM were never going to deliver to

13  you in Toledo.  We wished the whole case were limited to

14  Toledo.  That would have been great for us.

15        The problem is deliveries didn't occur in Toledo.  The

16  elevators made decisions to make those deliveries all over the

17  place.  The futures contracts is a unified, nationwide market

18  based in Chicago.  There is no market in Toledo.

19        There's a Toledo region where we can take deliveries.

20  When we make cash purchases, you're right, we do them in

21  Toledo.  This is not cash purchases.  These are people

22  delivering on futures contracts, and those elevators, those

23  suppliers deciding to make us go to Memphis or Evansville or

24  all the way down the Mississippi River or to Toledo.

25        We can't limit it to Toledo because the

1    counter-parties to those contracts who could have been

2    supplying Kraft with wheat pursuant to the futures contracts

3    didn't limit it to Toledo.

4             THE COURT:  With respect to Category 3, what is the

5    form of that discovery that you think is narrowly tailored to

6    your objective?

7             MR. THOMPSON:  Let me tell you that, your Honor.

8    There are -- if -- there are two category -- there are two of

9    our categories that address this discovery.  The first is

10   records -- individual transaction records for the -- and it is

11   a handful of occasions when ADM actually registered a

12   certificate for delivery, what happened when they did it.

13            The other thing is the e-mail that would relate to

14   discussions within ADM about whether to, where to, why to make

15   delivery --

16            THE COURT:  You say -- let me break it out in two

17   things --

18            MR. THOMPSON:  Yes.

19            THE COURT:  -- because I have concerns about the scope

20   of the e-mail discovery.

21            But when you say records, what type of record are you

22   asking for?

23            MR. THOMPSON:  Typically they'll have transaction

24   records.  They will -- when they -- when they -- they will show

25   that they have a registered -- a registered certificate for

1    delivery, and they will then have records showing what happened

2    after they registered that certificate for delivery.

3         Everybody who participates in the futures market needs

4    to keep track of exactly what they do to execute on each of

5    these futures contracts, so ADM will necessarily know here's

6    contract No. 117862.  We registered it for delivery.  Here's

7    what happened to it.  They have those records.  We don't have

8    them.

9         THE COURT:  Do you want to address -- I know I'm

10   drilling down on it, but can you -- do you want to address that

11   records?  He's saying that that's not voluminous, those

12   records, and not limited to, for the purposes of our discussion

13   here, to the two warehouses.  But if that was corporate-wide,

14   what kind of a burden would that place on ADM?

15        MR. NISSEN:  Your Honor, as long as it doesn't drill

16   too deeply into each transaction, I don't -- I don't think it

17   would be hugely significant as long as we're staying out of

18   e-mails and really just looking at the transaction records.

19        I think you could get into Cargill vessels and things

20   like that and barges, which I think are beyond the scope of

21   what they're talking about here.  But if it's just made or took

22   delivery and, you know, did they cancel the receipts, did they

23   sell them to someone else, did they load out, I can't say that

24   that would be, you know, hugely burdensome.

25        THE COURT:  All right.

1           MR. NISSEN:  I think relevance is the bigger issue

2     there.

3           THE COURT:  Well, let's break it out.  So is there an

4     agreed statement as to how you would formulate or describe that

5     category of documents if it was corporate-wide, if you will,

6     those records?  I'm not talking about e-mails.  I'm just

7     talking about the records to address his concern.

8           How would you phrase that, Counsel?  Is there a way

9     the parties could both agree to phrase that discovery?

10          MR. NISSEN:  I think we could.

11          THE COURT:  All right.  Well, can you do it right now?

12          MR. NISSEN:  Oh, can I do it right now?

13          THE COURT:  'Cause now is the time where everyone's in

14    the same room.  So you might as well just figure out what the

15    phrase is so we don't have to come back and say, Well, I didn't

16    think that's what he meant by that.

17          MR. NISSEN:  Sure.  I think it would be sufficient

18    records to show when ADM made or took delivery during this

19    period of time on that SRW wheat.  And I think what they want

20    to know is and what was -- what the disposition of those

21    certificates where they took delivery.

22          They don't know.  When they make delivery, that's

23    somebody else.  If they take delivery, how did they dispose of

24    those certificates?

25          MR. THOMPSON:  I mean, we're addressing it also when

1    they make delivery.

2            THE COURT:  Okay.

3            MR. THOMPSON:  His description --

4            THE COURT:  That's --

5            MR. THOMPSON:  So long as it includes counter-party

6    information, it would be sufficient for us.

7            THE COURT:  Okay.  All right.  Now, let's talk about

8    the e-mail.  I understand what you're looking for in the

9    e-mail, but you're -- the way you've formulated the e-mail

10   request seems to capture more than what you're asking for.

11           Can you address that because I'm concerned about that.

12           MR. THOMPSON:  I certainly can.  And, your Honor, all

13   I will say is I've tried repeatedly to discuss that with ADM.

14   Every other case I've had where we've done e-mail searches by

15   search terms, it's been an iterative process.

16           Initially when I called counsel for ADM and said, Hey,

17   are you gonna -- can you produce any of this stuff, they said,

18   Can you send me the search terms that have been used with other

19   searches with elevators.  I thought this is promising.  This is

20   what I usually do.

21           I send you the set of search terms.  You write back

22   and say, you know, this term seems too broad, can we limit this

23   one in time?  This one has no application to an individual

24   custodian, could we carve it out, and we would have gone on the

25   way and discussed breaking those search terms down and making

1    them precise enough to target exactly what we wanted and

2    eliminate the noise.

3            THE COURT:  Well, why don't you try to eliminate the

4    noise on your own?  How would you formulate your discovery

5    requests with respect to e-mails in a way that would be

6    narrowly tailored to what you need?

7            MR. THOMPSON:  And I try -- and I tried to do that in

8    the e-mail search that I included in the status report, your

9    Honor.

10           THE COURT:  Well, I know, but that had a lot of

11   custodians, and there was an issue regarding whether or not

12   some of those custodians were even relevant now.  And the

13   search terms went beyond what it appears that you were asking

14   for.

15           So as you stand here and I -- 'cause I read what was

16   in the status report.  I read everything.  So give it -- take

17   another swing at it in terms of the ESI 'cause the -- you need

18   to have identified custodians and search terms that are not

19   going to capture everything.

20           I mean, you've got -- you've got some pretty broad

21   search terms in there.  So think about what you -- what you

22   want 'cause you don't want to have them produce too much

23   because it's going to drive the cost up.

24           MR. THOMPSON:  I will do that, your Honor.  We will

25   take a stab at that.  I do want to note that we didn't make

1    these up in a vacuum.  These are the search terms we used --

2              THE COURT:  No, I know that.

3              MR. THOMPSON:  We used them with another elevator, and

4    they produced something like 450 or 475 responsive documents.

5              THE COURT:  Yeah, but, you know, ADM might be in a

6    different situation.  They might have, you know, how many fold

7    e-mails in addition to what some other party might have so --

8              MR. THOMPSON:  Well, we're now -- we're focused now on

9    one, maybe two custodians, so that seems unlikely.

10             THE COURT:  All right.

11             MR. THOMPSON:  I'm happy --

12             THE COURT:  Okay.

13             MR. THOMPSON:  I'm happy to take a stab at

14   narrowing --

15             THE COURT:  Well, let's do it right now.

16             MR. THOMPSON:  Absolutely we'll do that.

17             THE REPORTER:  Wait, one at a time.

18             MR. THOMPSON:  I'm sorry.

19             THE COURT:  Let's do it right now.  What custodians do

20   you think are needed?  Which ones?

21             MR. THOMPSON:  You have to tell me which two of the

22   three we identified are no longer with you and you no longer

23   have records for.

24             THE COURT:  I think you in the status report

25   identified one as being relevant; is that right?

1          MR. NISSEN:  Correct.  Your Honor, they asked for

2     three, and we determined that two of them have no e-mails.  So

3     Gergen is the one of the three.

4          THE COURT:  Okay.

5          MR. NISSEN:  And I believe that was put in our status

6     report.

7          THE COURT:  It was.

8          MR. THOMPSON:  Yeah, it was.  I just couldn't remember

9     the name.

10          THE COURT:  Okay.

11          MR. THOMPSON:  I was looking for it, though.

12          THE COURT:  So -- I'm sorry, we got to really try to

13     not speak all at the same time, and I'm as guilty of that as

14     everybody else.

15          So the one custodian would be that one individual.

16     Could you state that person's name for the record.

17          MR. THOMPSON:  Mark Gergen, G-E-R-G-E-N.

18          THE COURT:  Okay.

19          MR. THOMPSON:  And that's Mark with a K.

20          THE COURT:  And that time frame would be that June of

21     2011 --

22          MR. THOMPSON:  June.

23          THE COURT:  -- to December 31st, 2011 --

24          MR. THOMPSON:  Right.

25          THE COURT:  -- correct?

1        MR. THOMPSON:  June of 2011 through December of 2011.

2        THE COURT:  All right.  Look at those search terms and

3   see if you can narrow those to what you're looking for.

4   Because the search terms you've got capture -- I can just look

5   at them and see they're going to capture a lot of irrelevant

6   material.

7        MR. THOMPSON:  Okay.  Instead of "offer and wheat,"

8   which is a search term, "offer" and "wheat," I recognize that

9   will capture a broad category.

10        THE COURT:  "Wheat" is going to capture a lot.

11        MR. THOMPSON:  The -- right.  And we're trying to use

12   that in conjunction with other terms.  Obviously no one wants

13   every e-mail ADM has that relates to wheat.  That would be

14   crazy.

15        Given "offer" and "wheat" would be too broad, why

16   don't we limit to where "offer" is within, say, 15 terms of

17   "wheat" to make -- all we're interested in are offers relating

18   to wheat.

19        So instead of "offers" and "wheat," you know, "offers"

20   within 15 of "wheat," narrowing it to making sure that when

21   we're talking about an offer, it's actually an offer for wheat.

22        We don't anticipate and our experience has not been

23   that including the search term "Kraft" leads to a large number

24   of hits.  We're just not top of mind in these elevators.

25        MR. NISSEN:  All right.

1      MR. THOMPSON:  They're not writing e-mails about us

2  all day.

3      THE COURT:  Hold on a second.

4      MR. THOMPSON:  Yeah.

5      THE COURT:  And I apologize for interrupting.  What I

6  want to do and put on the record right now is what your best

7  assessment is of a narrowly tailored search term.  So --

8      MR. THOMPSON:  Yes.

9      THE COURT:  -- go ahead and just give those to me, and

10  then we'll discuss them.

11      So you've got "offer" within 15 of "wheat," "Kraft,"

12  and what other search terms?

13      MR. THOMPSON:  "Deliver."  And I would limit that in

14  the same way we've limited "wheat."  Same thing we've done with

15  "offer" and "wheat."  We're not interested in every time they

16  talk about delivery.  We are interested when they're talking

17  about delivery related to wheat.

18      So instead of having "deliver" exclamation point, it

19  would be "deliver" within 15 of "wheat."  Again, all we're

20  interested in is discussions relating to deliveries of wheat,

21  not every time ADM considers the delivery of something.

22      THE COURT:  Any other search terms?

23      MR. THOMPSON:  I think we could -- we could eliminate

24  "Toledo" as a search term.  I mean, again, I'm not interested

25  in all discussions relating to Toledo.  If it was --

1          THE COURT:  Yeah, that alone will get a bunch of --

2          MR. THOMPSON:  Right.

3          THE COURT:  -- non-pertinence.

4          MR. THOMPSON:  Right.

5          THE COURT:  Go ahead.

6          MR. THOMPSON:  So strike the term "Toledo."

7     And then "spread" also will be broad.  Let's do the

8     same thing that we've done with the others.  Not just spread,

9     it's "spread" also within 15 of "wheat."  That way, we're

10    limiting it to situations where they're talking -- they're

11    talking about the spread relates to the spread of wheat.

12         "Carry" and "VSR," we don't think are going to

13    generate excess noise, so we would propose leaving those in,

14    striking Toledo.

15         So, your Honor, so I can sum up, what I would propose

16    is a search -- one search in which we would search for the

17    following terms:  "Offer" within 15 of "wheat" or "Kraft" or

18    "deliver" root within 15 of "wheat" or "spread" root expander

19    within 15 of "wheat" or "carry" or "VSR."

20         THE COURT:  All right.  Counsel, that's a lot more

21    narrow than what was previously proposed.  What's your position

22    with respect to that e-mail request?  For example, running it,

23    seeing how many hits there are and see whether or not there's

24    still a proportionality issue.

25         MR. THOMPSON:  And exactly.  I would expect if there

1    is -- if one of these terms we don't expect leads to a whole

2    bunch of hits, then we'll figure out a way to narrow it.  I

3    don't want the noise either.

4         THE COURT:  What's your thought?

5         MR. NISSEN:  Could I just clarify, your Honor.  'Cause

6    I thought "carry" and "VSR" were being eliminated, and then at

7    the very tail end --

8         MR. THOMPSON:  No.

9         MR. NISSEN:  -- it sounds like --

10        MR. THOMPSON:  No, I said I don't think they're going

11   to generate noise if we leave them in.  So I was proposing

12   leaving them in.

13        MR. NISSEN:  Well, your Honor, first of all, when we

14   were here last, counsel had one request.  He said "Kraft" and

15   "wheat" and that was it.

16        MR. THOMPSON:  Your Honor, and just --

17        THE COURT:  Hang on a second.  We really have to be

18   disciplined about not speaking --

19        MR. THOMPSON:  I'm sorry.

20        THE COURT:  -- at the same time.

21        MR. THOMPSON:  I'm sorry.

22        THE COURT:  So please let --

23        MR. NISSEN:  Sorry.

24        THE COURT:  Okay.  Everyone's got to take turns, okay,

25   please, or the record's not going to be clear.

1          Go ahead, Counsel, finish your thought.

2          MR. NISSEN:  Your Honor, when we were here last,

3     counsel for Kraft said one search "Kraft" and "wheat" through

4     these custodians.  And we've sent back in our corners to narrow

5     it, and now it's hugely broader than it was before with all

6     these requests even as talked about today.

7          I would say this epitomizes what we've been talking

8     about the entire time.  They want to get into ADM's daily

9     business for all these seven months.

10         Offer vers -- within 15 of wheat, that is -- that's

11    their business is offering.  And offers can be in the futures

12    market or in the cash market.  That's what they do all day

13    long.  They bid and offer in the various markets.

14         The word "Kraft," as I understand it, ADM sells Kraft

15    hundreds of products.  So to put "Kraft" in there, that -- that

16    would pull in any kind of relationship with Kraft.

17         "Deliver" within 15 of "wheat," that has -- that's not

18    limited to these -- what we just talked about on delivery of

19    futures contracts.  That's any kind of delivery.  That could be

20    delivery anywhere in the world, any kind of -- any kind of cash

21    delivery, any -- as well as the futures delivery.

22         "Spread" within 15 of "wheat," the spreads are

23    people -- people talk about those all the -- all the time.

24    They talk about them daily because that's one of the economic

25    market measures people look at, what's the spread between this

1    and that.

2            "Carry."  Carry, again, that's a very common term

3    because that's -- that's inherent in every grain contract.  The

4    carry is a piece.  When you have a difference between two

5    months, the carry is the difference in price from let's say

6    this month and three months from now.  The difference is

7    typically called the carry because that's -- that's the storage

8    cost and insurance cost and things like that that where you can

9    hold grain.

10           "VSR," I mean, that's -- I have no idea how much that

11   would go, you know, yes or no.  That's -- that's an exchange --

12   exchange type of measure that I don't know if it's in there at

13   all or not or how relevant it would be.  But I think -- I think

14   basically this search -- and it's not -- counsel says one

15   search.  I see 1, 2, 3, 4, 5, 6 searches here, not one search.

16           And as we costed it out, really more on the limited

17   "Kraft" and "wheat" that counsel talked about at our last

18   hearing, it was -- it was well into six figures in terms of our

19   projected cost for doing this.

20           MR. THOMPSON:  Your Honor --

21           THE COURT:  Do you need to respond to that?  Go ahead.

22           MR. THOMPSON:  Yeah, I'd like to very much.  Just so

23   we're clear, last time when we were discussing Category 5,

24   which is e-mails related to Kraft, I said we can do that search

25   simply by just saying "Kraft" and "wheat."

1          So we were talking about a category that's limited to

2     e-mail searches relating to Kraft.  We never proposed that as

3     the only e-mail search we'd do.  That makes no sense.

4          I've -- your Honor, all I can tell you -- I haven't

5     seen their documents.  I'm not interested in a bunch of junk.

6     We are using search terms that we've used with other elevators.

7     Per your request, I've stood here today and narrowed them as

8     best I can to make them as tight as possible.

9          I would propose we run one search on these on the

10    single custodians we've now been whittled down to and see what

11    we get.  And if some of these search terms produce a thousand

12    documents, if carry's in there a thousand times, then we'll

13    revise it and I'll take it out because I'm not interested in a

14    thousand documents that say, you know, "I carried my lunch with

15    me to work today."

16         THE COURT:  Your cost estimate is based not on running

17    the search, but reviewing those documents prior to production,

18    correct?

19         MR. NISSEN:  Review?  Yes.  Yes, your Honor.

20         THE COURT:  So if there was a set of search terms and

21    we saw how many hits there were, then we would be in a better

22    position to see whether or not the cost estimates are accurate

23    and whether or not Kraft would be willing to bear the payment

24    for any of those costs, right?

25         MR. NISSEN:  There's a certain amount of cost just in

1     running those, your Honor.

2             THE COURT:  Well, that's what I'm trying to identify.

3             How much of that six figures is plugging in the terms

4     and pushing "enter"?

5             MR. NISSEN:  I would --

6             THE COURT:  Because normally running e-mail searches

7     doesn't cost a whole lot of money.

8             MR. THOMPSON:  No.

9             THE COURT:  If any.

10            MR. THOMPSON:  Correct.

11            MR. NISSEN:  I would say we -- the part of that that

12    would, you know, not include the attorney's fees, probably

13    between 10 and $20,000.

14            THE COURT:  To do the search?

15            MR. THOMPSON:  To do the search or do the search and

16    store it and produce it and --

17            MR. NISSEN:  You've got -- you've got --

18            MR. THOMPSON:  -- send it to them?

19            MR. NISSEN:  You do it with a vendor, your Honor.

20    You've got to send it to a vendor.  They've got minimum charges

21    you have to pay.  They host it.  You've got to have that, and

22    then they've got to do the searches.

23            So yes, I would say the estimate just to run the

24    searches is somewhere in the neighborhood of 10 -- neighborhood

25    of 10 to $20,000.

1          THE COURT:  Have you considered whether or not Kraft

2     is willing to bear any of the cost of the production?

3          MR. THOMPSON:  To this point, your Honor, we haven't

4     had those discussions because it's been a hard stop on any

5     e-mail discovery.

6          THE COURT:  All right.  Do you want to do that?

7     'Cause I wanted the parties to be able -- 'cause the fact that

8     there would be no e-mail discovery is probably not the approach

9     the Court would take.

10          But the e-mail discovery that's been proposed seems

11     overbroad, and I'm concerned about potential cost to a third

12     party, a non-party really.  And what I want to do is try to

13     find a way that is equitable to both sides.

14          For example, let's say you get the discovery.  How are

15     you going to use it in court?  If it doesn't have the word

16     "Kraft" in it and you already have these other pieces of

17     discovery, how is that e-mail going to be used at court or in

18     any dispositive motion or a deposition?

19          If it doesn't say "Kraft" in it and you already have

20     the other discovery, I'm trying to figure out what the, you

21     know, "offer," "wheat" e-mails are going to do for you.

22          MR. THOMPSON:  We will use --

23          THE COURT:  Do you follow my question?

24          MR. THOMPSON:  I think I do, your Honor.

25          THE COURT:  Okay.

1          MR. THOMPSON:  So I'll try and answer it.

2          THE COURT:  Okay.

3          MR. THOMPSON:  And I'll answer it by giving you

4     examples.  So we've taken depositions of other elevators.

5     Those other elevators have had e-mails that have discussed

6     their strategy as they approach considerations of whether to

7     stand for delivery on certificates they've registered.

8          We've taken those depositions of those people, and

9     that testimony we will use to establish what the market

10    conditions were, what others in the market were doing.

11         So were -- can the CFTC establish that it was

12    necessarily uneconomical for Kraft to believe that it might get

13    delivery on its December of 2011 contracts?  We will now have

14    evidence from other elevators, either potential counter-parties

15    to Kraft or who were looking to take delivery at exactly the

16    same time under exactly the same contracts and what they did.

17         And we will use that evidence to establish the

18    conditions that Kraft was facing when it was making its

19    decisions about how to handle its futures contracts.  And we

20    would propose doing that with ADM just as we've done it with

21    Cargill and the Andersons and CGB and all the others.

22         THE COURT:  Do you want to respond to that?

23         MR. NISSEN:  Yes, your Honor.  I mean, once again,

24    Kraft has shown no -- no relationship of ADM to this -- this is

25    their daily business, your Honor.  All we -- grain companies --

1  and they're not elevators.  This is 150 plus elevators, and I

2  think it denigrates them to keep calling them an elevator.

3  This is -- this is a grain company that has many, many

4  elevators around the country.

5          But they -- their daily business is to look at the

6  economics of any kind of delivery or purchase of futures

7  contracts in relation to their own physical supplies.  And so

8  what Kraft wants to do is get into ADM's personal business

9  here, and they -- they've identified two purchases or sales

10  they said between -- where Kraft purchased twice from ADM.

11          We offered to give them all the documents pertaining

12  to that.  They're not interested in that.  They want to fish.

13  They're looking for sound bytes that they can say, Oh, somebody

14  said this about the spread or somebody said this about the

15  market.

16          That's what they're looking for.  It's a pure fishing

17  expedition, and it's really, when you look at these terms, it's

18  their daily business.  That's what people are constantly doing

19  on the phone all day long is looking at the economics of what

20  they're going to do.  And that's their business.  It's based on

21  their particular situation, and I just don't see that it's

22  relevant to Kraft.

23          MR. THOMPSON:  Your Honor, it's centrally relevant.

24  This is a market that works on supply and demand.  ADM is

25  supply.

1         We're trying to figure out what the market conditions

2    were, and we can't figure that out without understanding what

3    the primary market participants were doing.  We've gotten that

4    information from the other market participants.  Now we're

5    seeking it from ADM.

6         THE COURT:  Is Kraft willing to post any -- or offer

7    any funds to help defray the cost of the production?

8         MR. THOMPSON:  Kraft will do whatever your Honor

9    orders.

10        THE COURT:  You don't want to say that on the record.

11        (Laughter.)

12        MR. THOMPSON:  We would -- if you direct us --

13        THE COURT:  Well, I'm trying --

14        MR. THOMPSON:  -- to fund the e-discovery, then we're

15   going to do it.  We're not going to say, oh, no, if we have to

16   pay for it, we don't want it.  If you direct that we have to

17   fund some or all of the e-mail discovery, then the discovery

18   matters enough to us that we'll do it.

19        THE COURT:  What's your response to that, Counsel?

20        MR. NISSEN:  Your Honor, well, I would say if the

21   Court's going to rule against us, we would definitely want

22   costs.  But we would urge the Court that's not -- that's not

23   the biggest issue, your Honor.

24        The biggest issue is the relevance getting into ADM's

25   personal business information, dragging them into this

1    lawsuit -- and as counsel said, okay, next step, he's already

2    thinking about taking depositions.

3            Once you get e-mails, you say, well, now we can't

4    understand these e-mails unless we can get the witnesses.  So

5    all of a sudden, an uninvolved party is dragged into a case

6    that has nothing to do with it because Kraft is fishing for

7    information that it has no idea what it's going to find, no

8    idea what it expects to find.

9            They've identified no specific deliveries that they

10   say moved the market.  No specific transactions that they say

11   are relevant to their case.  No dealings with ADM that are

12   relevant to their case except for those two transactions which

13   we've agreed to give them.

14           And we think that the Court ought to limit this to non

15   e-mail discovery and limit it to that Toledo area because

16   that's the focus of the case.  The whole case, as I read the

17   complaint, is Kraft did what it did in the futures market in

18   order to drive down the cash price in Toledo.

19           That's, I think, the simple main theme of it.  And so

20   to the extent ADM's in the Toledo market, it's willing to do

21   this non e-mail discovery out of Toledo and provide them with

22   futures, cash transactions and, you know, any deliveries that

23   related to Toledo.

24           MR. THOMPSON:  Your Honor, I don't need to respond.

25           THE COURT:  Okay.

1    MR. THOMPSON:  I've explained why this is relevant to

2    Kraft and why the issues that have been raised by the CFTC in a

3    lawsuit that Mr.Nissen hasn't been involved in are, in fact,

4    central to the case.

5    THE COURT:  Do you need to address orally any other

6    categories?

7    MR. THOMPSON:  Very, very briefly, your Honor.  We

8    haven't touched on Category 1.

9    THE COURT:  Okay.

10    MR. THOMPSON:  And in Category 1, ADM has offered to

11    give us hedge reports from Toledo and Ottawa Lake which we

12    asked for as part of Toledo.

13    The problem we -- while we appreciate that offer, your

14    Honor, the problem we have is that the futures market, unlike

15    the cash wheat market, there's -- cash wheat transactions are

16    relevant in Toledo.

17    We're talking in that -- in Category 1 about all

18    futures positions that ADM entered into.  When we've asked and

19    gotten this from other elevators, they've been able to give us

20    an electronic report that has this information at the touch of

21    a button because all of this information is stored

22    electronically.

23    The trades are made on the Board of Trade

24    electronically.  So everybody else has been able to generate a

25    report.  I can't tell you what ADM does or doesn't have.  I

1    just -- we're surprised that they can't give us a report of

2    their futures positions relatively easily only because others,

3    similarly situated entities have been able to.  And that's what

4    we're looking for.

5            And one more thing, your Honor, that's information we

6    can't get from somewhere else.  We've tried.

7            THE COURT:  And the hedge reports, I don't know what

8    the form of that actually looks like.  Would it contain the,

9    you know, the dates, specific trades, prices, volume?

10           MR. NISSEN:  That's my understanding, your Honor.

11           THE COURT:  It would?

12           MR. NISSEN:  I've not seen it.

13           THE COURT:  Okay.

14           MR. NISSEN:  But that's my understanding of what it

15   would do.  But it would be localized as to those two Toledo

16   warehouses.

17           THE COURT:  So your main concern is not the hedge

18   report itself, but whether or not it's Toledo and Ottawa or

19   whether or not it would be corporate-wide, right?

20           MR. THOMPSON:  I don't know what the hedge report

21   shows.  So yes, my concern is that a limited view of the

22   futures positions they've taken doesn't tell us what we need to

23   know.

24           THE COURT:  Okay.  Anything else?

25           MR. NISSEN:  Yes, your Honor.

1          THE COURT:  Yeah.

2          MR. NISSEN:  Again, no relevance to the case.  I mean,

3     I think in essence, they proved too much by what they're

4     saying.  They can have the entire market.  That's all

5     commercially available.

6          Why they have to know a single player in the market --

7     and especially the other thing about it is ADM is a hedger.  So

8     I would think they might be more interested in speculators who

9     are just looking at the prices in the market.  ADM has a

10    physical position.  You can't understand what they're doing

11    without knowing their physical position.

12         And so -- and so for Kraft to try to say they have to

13    have this, it's really not very meaningful.  Now, again, with

14    Toledo, that's what the Court identified at the end of the last

15    hearing as an area we ought to talk about.  That's an area

16    they've said is important to them.

17         That's where the CFTC says they were trying to depress

18    the prices.  That's where we're willing to give them, even

19    though we don't really think it's even relevant there.  But to

20    resolve this, we're willing to provide the Toledo futures and

21    the Toledo deliveries and the Toledo cash transactions.

22         MR. THOMPSON:  Your Honor, I've explained why -- in

23    our motion why we need the entire market and why we've gotten

24    the entire market from others when we're not focused just on

25    cash transactions which are relevant to Toledo.

1              THE COURT:  Okay.  Anything further on behalf of any

2    party with respect to the motion?

3              MR. THOMPSON:  Not from me, your Honor.

4              MR. NISSEN:  No, your Honor.

5              THE COURT:  All right, great.  I'll issue a written

6    order, and I'll do that fairly shortly, but probably by the end

7    of tomorrow.

8              Do we need a next court date in the case generally?

9    It was like yeah, my time.  Sorry for the delay.

10              MR. McCALL:  Yes, your Honor.

11              THE COURT:  What would -- in light of everything else

12    that's going on, what's a meaningful date?

13              MR. McCALL:  Well, Mr. -- Mr. Howell and I have had

14    discussions over the last couple days, one about the discovery

15    cutoff.  The CFTC called us up and said, Hey, we think we're

16    going to need more time for discovery and we --

17              THE COURT:  What's our current cutoff?

18              MR. McCALL:  It's September 27th, I believe.

19              THE COURT:  Okay.

20              MR. McCALL:  And we agree with them, that we need more

21    time.  We've been working incredibly hard, I can say last week

22    to the point of personal exhaustion so -- and the CFTC's been

23    working very hard.

24              We've got a lot of depositions yet to take.  The CFTC

25    had a proposal that would have taken us into mid January.  We

1    think we're very close to them with respect to, you know, what

2    they proposed to us.

3           And so I think that we can probably come up with an

4    agreement and submit it to your Honor as a -- as a proposed

5    order.  But that's where we are, and I don't know that we need

6    an additional date perhaps in December.  You know, I don't -- I

7    don't know.  Rob, do you have a view?

8           MR. NISSEN:  No.  I mean, our preference would be to

9    move the date and set the date.  We propose the end of the year

10   with a couple weeks into January just because of the holidays

11   since we're doing depositions.  But I understand they need more

12   time to figure out how much more time they need.

13          MR. McCALL:  And we're --

14          THE COURT:  Go ahead.

15          MR. McCALL:  I know we're going to get there.  We're

16   going to get -- we're going to get to a point of agreement as

17   far as what the date is.

18          THE COURT:  Our current next court date's

19   September 8th; is that right?  Is that still live?

20          MR. McCALL:  I -- I don't recall that date off the top

21   of my head, your Honor.

22          MR. NISSEN:  I thought it was -- yeah, I thought it

23   was closer to the cutoff.

24          THE COURT:  Closer to the cutoff.  Why don't we -- why

25   don't we do this.  I'll let you know that the -- I'll strike

1    the close of fact discovery of September 27th, and then I'll

2    strike whatever other dates we have.

3          But what if we come in in the middle of October, and

4    the parties can report on where we are.  And then we'll see

5    what the assessment of the fact close at that time, and I'll

6    set a new fact close in October -- not in October, but we'll

7    have a hearing, we'll talk about the new one.

8          MR. THOMPSON:  That sounds good, your Honor.

9          THE COURT:  Does that sound adequate?

10         MR. NISSEN:  That sounds good with the CFTC.

11         THE COURT:  Gloria, give me a status.  We're going to

12   strike whatever dates we have, and we're going to set a status

13   in October and we're going to strike the fact close of 9-27.

14         THE CLERK:  Wednesday, October 18th at 9:45.

15         THE COURT:  Is that good for the parties for status?

16         MR. McCALL:  Yes.  We'll make it work.

17         MR. NISSEN:  Same.

18         MR. McCALL:  Somebody will be here.

19         THE COURT:  And rather than just say we need a lot

20   more time, if you could actually itemize, all right, this is

21   what we have left.  It's these depositions, it's these

22   individuals, it's this discovery 'cause that's gonna help

23   inform a meaningful date.

24         I'd like to be able to set one and actually have a

25   schedule in place so we can start getting our way to

1    dispositive motions or whatever else we need to do.

2          MR. McCALL:  And we've started.  We had those

3    discussions.  One of the issues we're facing is it's a lot of

4    third parties.  And so they're -- we're doing our best to

5    accommodate the third parties' schedules when we set these

6    depositions.

7          THE COURT:  Not according to ADM.  I'm kidding.  I

8    know -- I know full well the size of the case.  So don't worry

9    about it.  We're going to have a reasonable schedule.

10         All right.  Anything else the Court needs to address

11   today?

12         MR. McCALL:  No, your Honor.

13         THE COURT:  Thank you, Counsel.

14      (Concluded at 11:24 a.m.)

15                    * * * * * * * * * *

16                   C E R T I F I C A T E

17      I certify that the foregoing is a correct transcript of the

18   record of proceedings in the above-entitled matter.

19

20   /s/ LISA H. BREITER                      September 7, 2017
     LISA H. BREITER, CSR, RMR, CRR
21   Official Court Reporter

22

23

24

25